Bissell, P. J.
The growth of the state and the development of its industries are giving rise to an increasing litigation, and constantly-thrusting on our attention questions as yet undetermined in our jurisdiction, and compelling the court not only to apply settled principles, but often to determine what line of con-dieting adjudications shall be followed. It is not probable that a question of more intrinsic difficulty and of graver importance has been presented for consideration than the one suggested by this record.
The distressing casualty killed the owners of the Gumry Hotel, who were buried in its ruins, totally destroyed the building and wrought injury to the adjoining premises. The administrator of the estate was heretofore sued by one who was injured by the explosion, and in that suit we had occa *537 sion to determine whether the action against the proprietors, who were killed by the accident, survived their death. We held the action did not survive. Letson v. Brown, 11 Colo. App. 11.
The present suit was brought by the appellant, Bishop, to recover the damages resulting from the partial destruction of a part of the adjacent building which he owned. The necessities of the decision require the briefest statement of the circumstances of the accident. It occurred on the 18th of August, 1895. The hotel was then owned and operated by Gumry and Greiner and they had put and maintained in the basement of the hotel a boiler which furnished power for hoisting purposes and the various uses for which power was requisite in the management of the establishment. The boiler was in charge of one Leseher who was the engineer employed by the proprietors. The plaintiff substantially alleged his ownership of a four-story brick and stone building, occupied by a tenant, at a fixed rental. The ownership of Gumry & Greiner was stated, and the use of a steam boiler averred. The plaintiff then alleged that they did not keep the boiler in safe, sound and good repair, did not employ skillful, competent and prudent servants, but permitted the boiler which they knew to be weak, unsafe and out of repair, to be kept in use, and retained Leseher in their service, knowing him to be unskillful, negligent and addicted to the use of liquor. The plaintiff then charged that by reason of the Aveakness of the boiler and the failure to repair it, and the incompetency and negligence of the servant, the boiler exploded. The plaintiff then laid his ad damnum at |6,000. Issue Avas taken by proper answer and the case came to trial. On the conclusion of the plaintiff’s evidence he was non-suited, and from this judgment of nonsuit, he prosecutes this appeal.
It Avould be profitless, and not other than an attempt to satisfy counsel, who would probably remain unconvinced, to essay even a summary of the plaintiff’s testimony. We shall therefore in the discussion, simply express our conclusions *538 as to the result or legal effect of the plaintiff’s, case as he made it under the appropriate subdivisions of the opinion, and express in detail only the law, which as we conceive, bars the plaintiff’s recovery. In bringing a suit to recover damages for injuries occasioned by the act of another, as a general proposition the plaintiff assumes the burden to establish that the act which occasioned him the injury was negligently done, or that the defendant had omitted the care which the law imposes on him in the conduct of his own affairs, or the management and use of his own property. The old maxim sic utere tuo ut alienum non laedas is frequently used to express the idea of the duty which every man owes to his neighbor, but it is likewise frequently held to express an obligation other and greater than that which the law imposes. While a "much abused maxim in the extent to which its central idea has been applied, it contains a germ of legal truth which is as well expressed in that form as in any other. It is almost universally true, that he who would recover from his neighbor because of what he did, must show that the thing which the neighbor did was negligently done, or done without right. There are exceptions to the rule, and we shall ultimately consider whether this case is brought within an exception. If not, the case is still subject to the general doctrine which is of first importance and established by all the decisions, that the case must contain evidence which establishes, or from which the jury may reasonably conclude that the defendant was negligent in what he did, or in omitting to do that which he ought to have done to protect his neighbor! This is one of the fundamental principles in actions of negligence and wherever, as it has often been said, the evidence is consistent with either view, or as it is put in the Cotton case with “ the existence or nonexistence of negligence,” the matter should not be left to the jury. This principle must be kept in view during the consideration of this case. It ought not to be lost sight of in any action based on the negligence of a defendant. It does not often happen that the importance and significance of this principle *539 stand out so clearly as in the present case, and there are few in which its importance is more evident, because as we shall ultimately decide, it comes- within none of the exceptions laid down by well-considered cases in the United States. Cotton v. Wood (8 Com. B. N. S. ), 98 Eng. Com. Law, 566; Baulec v. Ry., 59 N. Y. 356; Hayes v. Ry., 97 N. Y. 259; Smith v. First Nat. Bank of Westfield, 99 Mass. 605; Wells et al. v. Coe, 9 Colo. 159; Holman v. Boston & Land Security Co., 20 Colo. 7. Many other cases might be cited, but since there are none to the contrary these will suffice to support our first premise.
So far as concerns the evidence it may be here stated, the plaintiff introduced no proof showing, or tending to show, that Gumry & Greiner were negligent in the use or maintenance of the boiler. It is quite true, there is evidence by one or two witnesses to the point that the boiler had been permitted to get out of repair, and in this respect the proprietors were negligent. Taking the plaintiff’s case, however, as a whole, and taking all of his evidence together, this fact was not established because he produced proof which tended to show not only that the boiler was a good boiler when purchased, but also that it had been put in complete repair, been properly tested by the authorities whose duty it was to examine it, and that a certificate was issued to the owners authorizing them to use it at a certain pressure. When the plaintiff made this proof, he surely negatived and overcame the very slight proof which he offered to the other proposition, and in this respect and to this extent, failed to show that the accident occurred because of the negligence of the owners, either in putting the boiler in, using it after it was placed in the hotel, or continuing to use it after it had gotten into a condition which rendered its use unsafe.
This premise is so closely interlocked with the subsequent proposition that we shall only further state the testimony in connection with the discussion of this element of the case. The basic principle on which the appellant contends he ought not to have been nonsuited is the presumption which he in *540 sists results from the accident. Put in simple shape, the appellant contends that when he made proof of the use of a boiler, and of the explosion and then proved his injuries, the presumption of negligence to be deduced from the fact of the explosion was enough to entitle him to go to the jury. This proposition we shall controvert and hold the law to be that no such presumption arises from the explosion of a stationary steam boiler. We will now state our conclusions respecting the proof. The only witn esses offered by the plaintiff were some half dozen in number, and all of them mechanics. According to their testimony, offered to establish their competency, it appeared that all but two were what are known as practical mechanics or boiler makers who had worked at their trade, been engaged in the running of stationary plants, and plants using steam power for a series of years. Whatever knowledge they had was acquired by experience in the use of metals, the manufacture of boilers, and the operation of steam plants. None of them save two made any pretension to what would probably be aptly termed a scientific mechanical and engineering education. In stating these facts we have no purpose to minimize the weight, force or value of the testimony given by them because we are quite ready to concede, and in fact firmly believe, that a large practical experience, if combined with an investigating spirit and an attempt to learn the principles by which scientific results may be ascertained and expressed, may equally, with a technical education, qualify the person to testify. What impresses us most with regard to the testimony of these witnesses is that none of them, or at least not more than two of them, seem to have much conception of either the structural or chemical properties of steel and iron, or of the modes and methods by which educated engineers in an investigation of this sort attempt to determine whether an explosion occurred by reason of a patent defect, or from some latent and inherent defect which the owner and operator of the boiler could not detect by the use of ordinary care. It is only with reference to this limitation that the suggestion has been made. As is the case *541 with most boiler explosions, judged by the records to be found in the hooks written by those who have made the subject a matter of scientific investigation, few explosions can be satisfactorily or easily explained. They are always involved in a mystery because the explosion which occasions the injury destroys the evidence by which what caused it can be determined. Indeed it may be said such is the consensus of opinion of the best authorities. We have taken the trouble to examine the scientific treatises on this subject, more probably for our own satisfaction than as a guide to aid us in the determination of this case, because we recognize the fact we must find in the record itself the material on which to rest our decision ; yet, we may be permitted to say, our investigations lead us to the conclusion that in few of these accidents, there being no other proof than the fact of the explosion, the examination of the boiler thereafter furnishes any material by which even scientific men can conclude what the cause was. There have been many accidents of this sort and as to the great bulk of them, unless there was direct testimony to some fact or some condition- established by competent proof tending to show a negligent act from which the jury might reasonably conclude the explosion resulted from negligence, there has been nothing whereon the jury could safely or rightly base a verdict. Where a boiler is in good condition, the plates of proper original strength, where the boiler has been well made, is properly equipped with safety valves which are in operation, and an explosion occurs, an engineer can never, as a matter of certainty, or even of great probability, express a satisfactory opinion with reference to the cause. Becurring to the testimony we find no evidence in the record tending to show any act of negligence on the part of Gumry & Greiner. It is quite true, and we concede, one or two of the witnesses testified that the boiler was in bad shape; that the flues were rusty and not clean, some rivet joints were leaking ; that the manhole had an iron rim in place of a steel one, and that on inspection they were ordered to put the boiler in proper shape. It may be urged this is enough to entitle the *542 plaintiff to go to the jury. Had he there rested, this might possibly have been true, and it might have cast the burden on the defendant to overcome the presumption of negligence which might be indulged from such proof. The trouble is, the plaintiff went further, and he introduced the boiler inspector of the city, who showed as much competency as most of the other witnesses, and by him it was established that in May, less than three months prior to the time of explosion, the boiler had been examined ; it had been put in proper condition ; it had been submitted to the hydrostatic test which is the severest test by which the power and sufficiency of a boiler is ascertained. It stood this test satisfactorily, and the inspector issued a certificate authorizing them to run it and run it at a pressure of seventy-five pounds per square inch. By this proof the plaintiff rebutted any presumption which might arise from the statements made by one or two of the other witnesses whose examination was made long prior to this time and who were without knowledge of the character or condition of the boiler at the time the explosion occurred. It may be well to suggest that there is other evidence in the case offered by these witnesses with reference to what they saw of the boiler after the explosion and the parts of it which they examined later. The boiler was blown into pieces, and remained in the fire for some time, but some of the plates and tubes were rescued from the ruins and submitted to the examination of these mechanics. We do not discover from reading their testimony that this examination disclosed anything whereon a presumption could be based that the boiler was made of poor material, not adapted to such uses, or that it was sucli material as ought not to have been used in the manufacture of a first-class boiler. The boiler was new in 1888 and this explosion, it will be observed, was but three months after it had been put into good condition and submitted to an inspection which proved satisfactory and whereon a certificate was issued. When it came to the inquiry whether the material of which the boiler was made was adequate and such as a boiler ought to be made of, the evi *543 d¿nee was exceedingly slight and unsatisfactory. The makers appear to have been reputable makers. This of itself is very slight, but it further appeared that the boiler possessed a certain tensile strength according to the certificate of the builder. We do not discover from the record that the material was submitted to a test after the explosion to determine whether the tensile strength which the boiler maker said was 80,000 pounds was true or otherwise. Neither do we discover any satisfactory evidence to show that these mechanics submitted the portions of the boiler which they saved, to tests by which its ductility was ascertained. We do find, however, evidence which leads us to conclude it must have possessed tensile strength of high grade and probably a good deal of ductility. It would perhaps be folly to incorporate into this opinion a statement of the scientific methods by which engineers determine these two qualities. It is enough to say the metal is subjected to a strain in the direction of its length and the rupture point measured by pounds of applied power determines the tensile strength of the metal. If it takes 80,000 pounds power to sever the rod or the plate, that is the measure of its tensile strength expressed in pounds. The plates are then subjected to various known engineering tests to determine ductility. They are bent so that the inner radius of the circle at the bend does not exceed one and one half times the thickness of the metal, it being reduced by pressure or by blows to this point. The ductility is ascertained by an examination of the circumference of the circle to determine to what extent, if at all, the metal exhibits evidences of fracture. This may be done either while the metal is cold or after it has been subjected to a well-known degree of heat, immersed in water of a particular temperature and then bent. These two methods are ordinarily used to determine the two qualities which boiler plates ought to possess. To some extent perhaps these tests were used, although we do not discover any thorough, complete and scientific test in this direction which would be satisfactory as a determination of the two questions. At all events, there *544 was nothing proven by the plaintiff tending to show that the plates of which the boiler was made did not possess both qualities to a degree sufficient to warrant their use in the construction of the boiler. It therefore follows the jury might not be permitted to infer negligence or conclude that the proprietors had used a boiler made of improper materials and had consequently been negligent in its use and maintenance. There is no evidence tending to show the absence of a safety valve, in fact, there is evidence tending to show there was one, because when the boiler inspector made the hydrostatic test he weighted it down in order to reach a pressure of 120 pounds. ' One of the mechanics attempted to give evidence to show negligence on the basis of leaky joints at some of the rivets, but this in no manner tended to show the boiler was in bad shape, or that the explosion resulted therefrom because a leaky joint is in many ways like the safety valve itself, and if the steam becomes too high or the pressure too great, it operates to permit the escape of steam and therefore to relieve the pressure. There was evidence given by some of the witnesses to the point that where the plates were ruptured there seemed to be what I can best term to the apprehension of the ordinary professional reader, an attenuation of the plates. This condition always exists where the plates possess great tensile power, combined with a marked degree of ductility. As the scientific engineers put it, if a bar or plate be subjected to a strain to determine its tensile strength, and at the point of final rupture there is no attenuation, but a direct fracture of the bar or plate, it remaining of its original size, this may demonstrate, dependent on the pounds of applied power which it stands, great tensile strength and little ductility; in other words, if the plate or the rod breaks without getting thin or stretching as it were, the plate or bar probably possesses very little ductility. These witnesses, however, testified that the plates seem to have been stretched and to have gotten thin at the point of rupture. This fact is of considerable significance since the tensile strength of the plates being established, the *545 ductility appearing from the attenuation would tend to show the plates possessed the two qualities essential to first-class metal for the manufacture of boilers. This is as full as we need state the history of the testimony because the whole case turns on this testimony, and this alone, so far as concerns any practical proof of the negligence of the deceased owners, and we are called thereon to apply the law and determine whether from these facts, none other being proven, there arises any presumption of negligence, and whether this amounts to any proof of negligence which entitled the plaintiff to go to the jury. We are in thorough accord with the trial judge who concluded the evidence did not show, and did not tend to show negligence on the part of Gumry & Greiner either in the purchase or in the use of the boiler. Such being the condition of the proof we must next inquire whether therefrom there will arise a presumption of negligence on proof of the fact of the explosion and the happening of the injury. Our answer must under the American authorities undoubtedly be in the negative. We very freely concede the English doctrine is to the contrary. While I personally do not accept the Rylands case (Rylands v. Fletcher, L. R. 3 House of Lords, 330), I concede it is the law in England although I do not believe it is in accord with the general American doctrine. It has been cited by the supreme court of this state, as I shall attempt to show, only in support of one proposition, or to uphold a recovery in a case which to my mind is clearly within exceptions to the general doctrine which prevails in this country. The Hylands case undoubtedly goes to the extreme length in the application of the underlying principle of sic títere tuo. Apply it to all the cases to which the principle must of necessity be applied, if it is to be adopted, and there are a multitude of cases which have been decided in this country which would have to be overruled and which could not on principle be distinguished or maintained. When that case is examined it will be observed the defendant built a reservoir on his own property to contain water. The plaintiff had mined underneath the soil without his *546 knowledge. Without evidence of negligence in the construction of the reservoir, or of negligence in its use or operation, a recovery was upheld on the ground that a man is bound to so use his own property that it does not hurt his neighbor. The principle was not expressed in exactly this form but that is the logical result of it. This being true, I do not concede it is the law in the United States, nor do I believe that the doctrine has been approved by the supreme court. We feel bound to notice this distinction because it is the gravamen of the argument of counsel. We are cited to The G. B. & L. Ry. Co. v. Eagles, 9 Colo. 544, as a case which approves the Bylands case. The only possible basis for this contention is that the case is cited in the opinion. There is nothing in the decision, in the facts presented, in the principles involved which would either require or permit or warrant any assertion that it is an approval of the Bylands decision. That was a case where a contractor in constructing a railroad grade was compelled to blast out rocks. In blasting the rock and cutting down the hill, rocks were thrown on to adjacent property and worked injury to the person, who brought suit against the railroad company. Recovery was had. Rightly, we think, but as we view it, the case is a direct exception to the general proposition that he who relies on negligence as a basis of a recovery, must prove it, and offer evidence which tends to show it. This was true, because as the court put it, the wrong was the proximate cause of the injury and the natural and probable consequence of the act, and in the light of the attendant circumstances it ought to have been foreseen. With this principle we have no quarrel. It must always be true that wherever injury is done and results from the act of the defendant and the injury is the natural and probable consequence of the act and ought to have been foreseen, there is a presumption of negligence and the defendant may be held liable though the plaintiff does not fully sustain the burden which is imposed on him in another class of cases. The inquiry here is, was the explosion of the boiler and the consequent damage the *547 natural and probable result of its use, and ought the owners to have foreseen these consequences as a probable result of its use ? This suggested inquiry must be answered in the negative. As a general proposition boilers do not explode. Steam boilers, stationary and movable, are in constant use all over the country, and while there have been a large number of calamitous accidents, both in this country and the old, from the use of steam which is a dangerous and powerful element, the proportion of explosions to the number of boilers in use is exceedingly small. As a matter of information it may be stated, the authorities who write on the question of boiler explosions state that in the matter of inspected boilers, both in this country and in Great Britain, but one out of every ten thousand explodes while in use. This is certainly a small percentage and we know as a matter of personal observation that boilers are in use all over the state, and that it has rarely happened that an explosion has occurred. The reasons why they explode are past finding out even by educated engineers, although they have resorted to all sorts of tests in order to discover the probable cause. They have permitted the water to get low and .then run in cold water; they have permitted it to become high and run in water; they have heated it to an undue and tremendous heat and then subjected it to the introduction of water, and they have done all the various things which engineers and experts have said were the causes to which explosions were attributable, in order to ascertain the conditions and circumstances under which an explosion would occur. The result seems to be that there is no known cause to Avhich a boiler explosion can be attributed without proof of some specific act of negligence. Whether this would be accepted by all engineers is not certain, though it accords Avith the statement of some of the most scientific of them. It is, however, needless to discuss it, because in the present case there is no proof of any specific act of negligence to which the explosion could be assigned. There is no proof of a thing done or omitted to be done. No evidence of the use of a boiler made of insufficient materials, *548 and nothing from which the jury would have a right to conclude Gumry & Greiner were negligent in its use. Under these circumstances we are not prepared to accept the doctrine that in an explosion there is a presumption of negligence. Boilers are too much of a necessity to the maintenance and success of the various industries in this country, to the production of steam for the heating of houses, hotels and blocks, and the furnishing of power which renders our mighty structures permissible and possible. The far-reaching effects of a contrary decision can be easily imagined and would almost forbid the use of boilers for many purposes to which they are now regarded as indispensable. The doctrine of the Rylands case has been examined by many appellate courts in this country. A large number of the states have concurred in the opinion that there is no presumption of negligence to be deduced from an explosion of a boiler, and if the plaintiff would recover because of an injury occasioned by an explosion, he is put to proof of some specific act of negligence to which it can be attributed. This rule is supported by so many able courts, in fact we may say there are substantially none to the contrary, that we now regard it as a settled American doctrine. Illinois is quoted as a state holding otherwise, but we do not regard this as true because the late case which is cited is in accord with the general trend of decision in the United States. Losee v. Buchanan, 51 N. Y. 476; Marshall v. Welwood, 38 N. J. L. 339; Cosulick v. Oil Co., 122 N. Y. 118; John Morris Co. v. Southworth, 154 Ill. 118; Louisville Ry. v. Lynch, 147 Ind. 165; Huff v. Austin, 46 Ohio St. 386; Racine v. N. Y. Central Ry., 70 Hun, 453; Young v. Bransford, 12 Lea, 232; Reiss v. N. Y. Steam Co., 128 N. Y. 103; Texas & Pacific Ry. Co. v. Barrett, 166 U. S. 617; Bradford Glycerine Co. v. Manufacturing Co., 60 Ohio St. 560. Vide also Nytro Glycerine Case, 15 Wall. 524, and Richmond & D. Ry. v. Elliott, 149 U. S. 266. This, array of strong and well-considered cases, reviewing the law applicable to the inquiry, supported by the most cogent reason and presenting irrefragable arguments, satisfies us that it is *549 the law of the United States' that proof of the explosion of a steam boiler under these circumstances does not make out a prima facie case. When, therefore, we conclude, as we must, that the plaintiff offered no proof of any specific act of negligence from which the jury could rightly conclude the explosion was the result of negligent acts or negligent omissions by Gumry & Greiner, the court very properly granted a nonsuit.
There is but one other proposition to which we need advert, and to this we need revert but casually. There was an attempt made to show that Lescher, the engineer employed by Gumry & Greiner, was a man of intemperate habits and an unfit person to be entrusted with the management and operation of the boiler, and perhaps some evidence offered to the point that on the night of the explosion he was intoxicated and unfit for duty, though the proof did not tend to show, nor was there any offered to show that he was on duty at the time he was seen to be intoxicated. The counsel’s statement as to what he intended to prove was very broad, but such was not his offer, nor did his questions as put accord with what he stated he intended to prove. It only presents the naked question whether it can be shown in a case like this that the engineer in charge of the boiler was a man of dissipated habits and a person unfit to be entrusted with the management of the boiler, when the intoxication is in no manner, by testimony or by offer, connected with the accident itself. In other words, when the plaintiff fails to offer to prove, or fails to prove, that the dissipated servant was in charge of the boiler at the time the explosion happened, or that he did or failed to do, at the time of the explosion, what a reasonably prudent and careful servant would have done, thereby contributing to the injury, may his habits be made a matter of evidence ? As already suggested, we do not regard this inquiry as a pivotal one. If the plaintiff had offered to prove, or had attempted to prove, that an act of a dissipated servant at the time contributed to the injury, then he might have gone quite a long
*550 ways in making the proof essential to show negligence or proved a fact from which the jury would have been warranted to conclude the explosion happened because of the negligence of the owners. Failing to go to this extent, and we think it is quite clear this is true, we do not regard the admission or rejection of the proof as of much consequence or that for the error, if it was one, the case should be reversed. When we conclude as we do, the plaintiff wholly failed to show any negligence either in omission or commission, and failed to prove . or offer to prove that a negligent act of a dissipated servant contributed to the injury, then we are brought face to face with the premise heretofore established that the plaintiff has failed to sustain his burden by showing affirmatively that Gumry & Greiner were negligent. Had the evidence been introduced it would in no manner have tended to prove negligence from which the jury could conclude the explosion was the result of what the owners did or failed to do. We have grave doubts, however, whether this evidence is admissible unless there be some direct proof to the point that the negligence of the dissipated servant contributed to the injury, and that the injury resulted from something which was done or from something which ought to have been done by the dissipated servant who was on duty at the time the injury occurred. This seems to be a principle established by the authorities though, as we have already said, we do not regard this as a fundamental inquiry essential to the disposition of the case. Warner v. N. Y. Central Ry., 44 N. Y. 465; McNally v. Colwell, 91 Mich. 527; Huntingdon v. Decker, 82 Pa. St. 119; Ward v. Ry., 85 Wis. 601; Sullivan v. Salt Lake City, 13 Utah, 122. We 'readily concede that in the Pennsylvania case cited, when it went up again to the supreme court, the admission of the evidence of the dissipated habits of one of the employees was upheld, but the case shows that the testimony not only tended to prove the incompetency of the employee but tended to show that the collision was the result of this employee’s carelessness. Railroad Co. v. Decker, 84 Pa. St. 419.
*551 We are not prepared to hold otherwise, nor do we know what our conclusion would be, nor do we intend to express what it might be under circumstances like those. All we hold is, that there is nothing in the case to show, and nothing which tended to show,'nor in fact anything in the offer which tended to prove that the explosion was the result of any negligent act of the alleged dissipated servant. This being true, we discover no error in the rejection of the testimony.
It is quite evident from what we have stated, the nonsuit was in our judgment right and proper, and the judgment entered thereon ought to be, and accordingly is affirmed.

Affirmed.