## No. 17,966.

### E. M. Davis and George K. Niehouse v. Velma M. Bonebrake.

(313 P. [2d] 982)

Decided July 1, 1957. Rehearing denied August 12, 1957.

508

Messrs. WAGNER & WYERS, for plaintiffs in error.

Mr. RICHARD H. SHAW, Mr. NORMAN B. SMITH, for defendant in error.

*En Banc.*

MR. JUSTICE FRANTZ delivered the opinion of the Court.

THIS is a malpractice action in which plaintiff obtained a favorable verdict against two doctors who seek re-

versal of the judgment entered thereon. According to the complaint, a surgical sponge or insoluble pack was left in plaintiff's abdomen in the performance of a hysterectomy on her on August 17, 1951. Since the case was tried and submitted to the jury on the first count, charging negligence, it becomes unnecessary to consider the second count, involving a claim based on breach of contract.

The complaint was filed on October 16, 1953. Later the first count was supplemented by a more definite statement of facts, after which defendants filed their answer containing two defenses, the first defense admitting the performance of the operation and otherwise denying the allegations of the complaint, and the second asserting the statute of limitations as a bar to the action.

At the conclusion of plaintiff's evidence the defendants moved for a "judgment of dismissal" on the ground, among several, that the action was barred by the statute of limitations. Plaintiff asked for and was granted leave to file an amended complaint, adding as an element of her claim the charge of fraudulent concealment by defendants of the fact that a surgical sponge had been left in her abdomen, and her discovery thereof in October 1953. Pursuant to such leave an amended complaint was filed before defendants started their defensive proof.

At the conclusion of all the evidence, the defendants filed their motion for a directed verdict. Among the grounds urged for directed verdict was a renewal of the assertion that plaintiff's claim was barred by the statute of limitations. This motion was denied.

That plaintiff was allowed to file an amended complaint in the face of asserted surprise and prejudice to the defendants, and that the trial court ruled adversely to defendants' contentions anent the tardy institution of suit, are said to be errors requiring reversal of the judgment.

After the complaint was filed, the defendants took the deposition of the plaintiff and of the witness Melvin R.

Gray, who acted as the surgical nurse at the operation on August 17, 1951, and a later operation on September 5, 1951. From these depositions the defendants ascertained the circumstances upon which plaintiff relied, showing how she discovered the alleged cause of her injury. All the evidence was repeated before the jury without objection to its admission on the grounds of surprise.

In the course of the deposition the following questions and answers were made:

"Q. About what size was it, Mrs. Bonebrake? A. Well, I remembered that as it came up here, it would be something like this (witness indicating). Q. About the size of a partially opened fist? A. Yes. Q. What general confirmation [sic] did it have, or present on the skin area? A. Well, it seemed like — well, as I remember it — I told you I was very sick, and my abdomen of course was distended. And as I remembered I just remembered it as a sort of a kind of a squarish or sort of rectangular — I can't describe it just exactly. I just remembered that this was my first complaint that there was a lump there. There is something there. * * * Q. Could you feel it? A. Yes, that is the way that it was (witness indicating)."

On cross examination in the trial the following testimony was elicited from the plaintiff:

"Q. Now, you thought it was foreign object of some kind, didn't you, Mrs. Bonebrake? A. Well, I didn't think you could grow something just that fast, Mr. Wagner. Q. The answer would be 'yes, you did think it was a foreign object of some kind.' A. I don't remember of saying it was a foreign object. I mean, I didn't make acquisitions [sic] to anyone. I didn't call Dr. Davis and say 'Hey, you left something in me. You come and take it out,' because at that time I really had a lot of faith in Dr. Davis, or I wouldn't have gone to him. Q. But you believe that it was not something that was part of you, is that correct? A. Well, I felt — I mean — there was

something there. That was my thought, Mr. Wagner."

She further testified that she did not remember saying that a foreign object was left in her body; that she had no idea of what was the matter, but knew something was wrong; that a number of other doctors examined her; that she was excited at the time of the taking of the deposition and that she made some remark about scissors or a pack being left in her. It appears in her testimony that she questioned the doctors about what was ailing her, stating to them that "something was wrong"; that she "knew that they had to do something — that [she] did not know what or why." She further testified that when she advised the doctors that she knew "something was wrong," they told her they would disclose at some future time the cause of her difficulties, and that they never made such disclosure. On two occasions she tried to ascertain from Gray what had taken place at the two operations, and for the first time learned that a surgical sponge, similar to those used in the August operation, was removed from her abdomen in the September operation. Gray revealed this fact to her at the second meeting.

As we view it, it was unnecessary to amend the complaint because the issue of fraudulent concealment was before the court in the state of the pleadings as made prior to the amended complaint. Rule 8 (c) provides for the affirmative defense of the statute of limitations. Rule 7 (a) provides for a complaint, answer, and a reply to a counterclaim. It also makes provision for cross-claims and answers thereto and for third party procedures, not involved here. It concludes as follows: "No other pleading shall be allowed, except that the court may order a reply to *any* answer." Rule 8 (d) concludes: "Averments in a pleading to which no responsive pleading is required or permitted shall be taken as denied or *avoided*." (Emphasis supplied.)

Since no reply was required under the Rules, the defendants were put on notice that any matter in

avoidance of the defense of the statute of limitations would be deemed in issue before the court. Under the Code, it was proper to raise the inapplication of the statute of limitations by replication. It was said in *Railway Conductors v. Jones*, 78 Colo. 80, 239 Pac. 882:

"The defendants pleaded the six-year statute of limitations. The plaintiff replied that the defendants fraudulently concealed their unlawful action from him until 1920, when he discovered it and brought his suit. The defendants demurred to this replication and the demurrer was overruled. That is assigned for error, but we think there was no error. *Bailey v. Glover*, 21 Wall. 342, 22 L. Ed. 636; 25 Cyc. 1213, and cases cited."

The plaintiff need not anticipate the assertion of the statute of limitations and therefore negate its effect in her complaint, for the defendants may waive such defense. "The statute of limitations is not ground for motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12 (b), Colorado Rules of Civil Procedure, since under Rule 8 (c) that is a defense which must be set forth affirmatively by answer. *Baker v. Sisk*, 1 Fed. Rules Decisions 232. Neither is it a basis for dismissal on motion on the ground that it appears from the complaint that the claim accrued more than six years before the commencement of the action in this state, for the reason that in the absence of an affirmative defense based on the statute such defense is waived, and the assertion or waiver of the defense can only be determined from the answer. Furthermore, even if pleaded, the running of the statute may have been tolled, and plaintiff in his complaint is not required to anticipate the defense." *Smith v. Kent Oil Co.*, 128 Colo. 80, 261 P. (2d) 149. See *O'Byrne v. Scofield*, 120 Colo. 572, 212 P. (2d) 867.

We hold that permission to file the amended complaint at the close of the plaintiff's evidence was not and could not be prejudicial to the defendants; the matter set forth therein in avoidance of the bar of the stat-

ute of limitations was already before the court, and hence nothing new was injected into the case. Nor could surprise be asserted in view of the revelations appearing in the deposition.

Defendants take the position that plaintiff knew of the presence of the sponge in her abdomen within a matter of days after her first operation, hinging their argument upon her testimony, as above outlined; therefore, they say, the suit was brought too late, and the trial court should have granted their motions "for judgment of dismissal" and for directed verdict.

The answer to this is that different minds could have honestly drawn different conclusions from the testimony on this question; that the evidence viewed in its most favorable light in behalf of plaintiff was substantial, and warranted submission of the question to the jury under proper instructions. *Grand Junction v. Lashmett,* 126 Colo. 256, 247 P. (2d) 909; *Singer v. Chitwood,* 126 Colo. 173, 247 P. (2d) 905.

But there is firmer ground upon which to sustain the action of the trial court. At best plaintiff's testimony as to the presence of a foreign body cannot arise above that of the conjecture of a non-observer of the event. The law which makes such testimony valueless and incompetent, and which at the same time establishes the value and competency of Gray's testimony, will now be considered.

Gray, who was the instrument nurse in the August and September operations, testified that in his opinion the substance removed from plaintiff's abdomen in the September operation was a type of surgical gauze; that the mass he saw taken from her was not attached in any way to any of the organs of the plaintiff; that "it was quite dark in color, as I could see, it was a mass which would be approximately the size and of the same substance as a lap sponge which was used in the operation on the 16th." Although Gray said he was testifying to the fact "of his own knowledge," he frequently gave it

as "his opinion," particularly on cross-examination, that the substance removed from plaintiff was a sponge, to which defendants objected on the ground it was opinion evidence, given by one not qualified to give it because the witness was not a graduate nurse. Upon the theory that it was speculative, and hence no evidence at all, the defendants moved for "judgment of dismissal" and for a directed verdict. Its admission, and the refusal of the trial court to grant said motions because such testimony ascended no higher than the level of conjecture, are said to be errors requiring reversal.

Whether testifying as a graduate nurse or as a lay person, Gray's testimony was admissible, and the credit and weight to be given to it was for the jury to determine. The applicable rule appears in McCormick on Evidence, page 20, in these words:

"While the law is exacting in demanding first hand observation, it is not so impractical as to insist upon preciseness of attention by the witness *in observing*, nor certainty of recollection in recounting the facts. Accordingly, when a witness uses such expressions as 'I think,' 'My impression is,' or 'In my opinion,' this will be no ground of objection if it appears that he merely speaks from an inattentive observation, or an unsure memory, though it will if the expressions are found to mean that he speaks from conjecture or from hearsay." (Emphasis supplied.)

If a witness employs such expressions as "I think," or "I believe," or "It is my impression," or "In my opinion," or similar statements, meaning that his uncertainty results either from a lack of close observation of the fact originally witnessed or from want of a clear recollection regarding it, his testimony is admissible, and the qualification goes to its weight; but if he means that he did not observe the fact at all, and so has no personal knowledge regarding it and has acquired his opinion from other sources, his testimony is incompetent. Wigmore on Evidence, Sections 658, 726, 727 and 728.

■ Applying the same standard to the plaintiff's testimony, any statement of hers concerning the presence of a sponge within her person could not result from observation, for the testimony clearly shows that in each operation she was completely anesthetized. Mere belief, the utmost value that can be given her testimony on this score, is not knowledge. "Between mere belief and knowledge there is a wide difference." *Iron Silver Mining Co. v. Reynolds,* 124 U.S. 374, 8 S.Ct. 598, 31 L. Ed. 466. When one is convinced of the truth or reality of a thing on grounds insufficient to afford knowledge, he believes. Such postulate does not warrant suit against a professional man; "it would be outrageous to * * * require [a claimant] to sue when good faith to his debtor forbade action." *Rosane v. Senger,* 112 Colo. 363, 149 P. (2d) 372.

■ Testimony to the effect that plaintiff was very sick after the August operation; that a number of doctors examined her; that she was again subjected to surgery in the identical anatomical area without disclosure at the time of why it was performed; that she was told afterwards the necessity for the second operation would in the future be divulged to her; that she sought information from the doctors, and on two occasions from Gray, concerning the exigency requiring the operation; and that on her second quest in October 1953 Gray informed her that the doctors removed a sponge from her abdomen, presented a fact situation for the jury to consider, weigh and determine. A question of fraudulent concealment evolves from this testimony. *Rosane v. Senger, supra.*

We proceed to the next ground urged by the defendants for reversal. They contend that the conversations between the plaintiff and Gray, which resulted in plaintiff receiving the information concerning the closing of the incision with the sponge left in her body, is hearsay evidence, and that its admission is highly prejudicial. Gray's deposition was used in the trial, but before any

part of it was read to the jury, the court and counsel met in chambers and reviewed his testimony for the purpose of determining what parts could be read to the jury.

After counsel for the defendants objected to that portion setting forth the conversation between Gray and plaintiff relating to the sponge being left in her, counsel for the plaintiff asked that the court admit it for the limited purpose of showing that the statements were made in October 1953 and that the jury be instructed that it was not being admitted for the truth of the statements made. To this the court said: "The court will rule on the measure if, and when it arises." When this testimony was read to the jury, plaintiff did not request the court to advise the jury the particular purpose for which it was being admitted, nor did the defendants make any objection to the reading of this material to the jury, and apparently the court, not being called upon to make a ruling, admitted it for consideration by the jury without restriction or limitation. It was incumbent upon the defendants to state their objection at the time it was sought to read this testimony to the jury. *McAllister v. McAllister,* 72 Colo. 28, 209 Pac. 788; *Eizerman v. Behn,* 9 Ill. App. (2d) 263, 132 N.E. (2d) 788. The rule is stated in the last cited case thus:

"It is a well-settled rule of law that evidence which is competent for one purpose does not become incompetent because the jury might improperly consider it in some other capacity for which it could not properly be admitted. The opponent of the evidence may, if he so wishes, ask for an instruction confining the evidence to its legitimate sphere; and if he fails to so act, he is deemed to have waived any objection he may have."

Gray was permitted to testify to the conversation between him and the plaintiff at a prior meeting. He testified: "Well, she came up to see me there, she was with some gentleman, and she said she wanted to talk to me, she said, 'I know that there was something radically wrong, and I think you know,' and she said to her knowl-

edge she said it was talked right through the hospital, but no one would talk to her. I did not know what she meant, but I said, 'I don't know what you mean,' and she wanted to know if I would explain to her what happened in the second operation, and I said, 'I don't feel that I want to talk about it,' and she said, 'Well, can't I see you again sometime and talk to you?' I said, 'Well, I don't know, I don't know if I am going to stay in Denver or not,' and that was all there was to it. She was kind of mad at me, I think, a little bit."

 Was the admission of these two conversations violative of the hearsay rule? As we view it, they escaped the ban of the hearsay rule. The propriety of the admission of this evidence is well stated by Wigmore on Evidence, 3rd Ed., Sections 1788, 1789. We quote: "The Hearsay rule forbids merely the use of an extrajudicial utterance as an assertion to evidence the fact asserted (ante, § 1766). Such a use would be testimonial, i.e., we should be asked to believe the fact because Doe asserted it to be true, precisely as we should be asked to believe Doe's similar assertion if made on the stand. What the Hearsay rule forbids (ante, § 1361) is the use of testimonial evidence — i.e., assertions — uttered not under cross-examination. If, then, an utterance can be used as circumstantial evidence, i.e., without inferring from it as an assertion to the fact asserted (ante, §§ 25, 245), the Hearsay rule does not oppose any barrier, because it is not applicable. For example, when it is material to show that Doe knew of a sale by Roe, the letter of notification by Roe to Doe, 'Take notice that I have this day sold a carload of wheat to J.S.,' is receivable, not as a testimonial assertion by Roe to prove the fact of sale, but as indicating circumstantially (i.e., indirectly) that Doe obtained knowledge of the sale; the fact of sale being proved by other evidence." "Wherever an utterance is offered to evidence the *state of mind* which ensued *in another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought

to be made of it, and the utterance is therefore admissible, so far as the Hearsay rule is concerned." The application of the rule, as enunciated in Wigmore on Evidence, is made under circumstances quite similar to those present here in *State v. Black*, 230 N.C. 448, 53 S.E. (2d) 443, from which we quote at some length:

"The court admitted the testimony of Lee as to the extrajudicial statements of Canady for the consideration of the jury 'upon the matter of the delay in the issuance of the warrants' and not for the purpose of establishing the truth of any matter asserted by Canady. As has been pointed out, it was proper for the prosecution to show in explanation of the evidence elicited by defendants on cross-examination of the State's witnesses that the delay in the issuance of the warrants was occasioned by some reason other than a consciousness of the weakness of the State's case on the part of its witnesses. The evidence objected to consisted of two parts: One, as to the state of Lee's mind, which certainly had a tendency to establish that the reason for his delay in commencing the prosecution was inconsistent with any consciousness of the weakness of the State's case on his part; and the other, as to the extrajudicial utterances made by Canady to Lee, which certainly had a relevancy to show the inducing cause of Lee's state of mind. The testimony was not concerned in any degree with the truth or falsity of any matter asserted by Canady in his unsworn statements. Hence, its probative force depended solely on the competency and credibility of Lee, the witness by whom it was produced.

"The court rightly admitted the evidence in question for the specific purpose for which it was offered under the evidential rule that 'whenever an utterance is offered to evidence the state of mind which ensued in another person in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the Hearsay rule is concerned."

These conversations were admissible as explanatory of the delay in bringing suit and of the motivation of plaintiff to bring suit once she discovered the reason for the second operation. The last information threw light on the time plaintiff became possessed of knowledge, a matter vital to the question of the timeliness of instituting suit. "Neither are the errors assigned based upon the admission of alleged hearsay and other improper testimony well taken, as the testimony of this character was admitted for the sole purpose of showing *what information had been received by Beach which moved him to act,* and the jury was so advised, and not for the purpose of establishing the truth of such information. For this purpose, and thus limited as it was, its admission was not error." (Emphasis supplied.) *Commercial Bank and Trust Company v. Beach,* 66 Colo. 226, 180 Pac. 982.

Plaintiff did not testify to the substance of the two conversations between her and Gray; she merely stated that she saw him on two occasions, and from what she learned on the second meeting she visited an attorney for the purpose of instituting a suit. These two quests for information have this in common — inquiry by plaintiff (hence, not testimonial in character) and answers made by Gray, the witness who related the conversations. Gray's oath and cross-examination were guaranties only in relation to the matters spoken by him, and not that plaintiff whose inquiries he is reporting was seeking the truth. This testimony was contained in his deposition, and was used in the trial of the cause. He was therefore subject to cross-examination as to these past statements, made in response to the inquiry of the plaintiff. In this aspect the testimony was admissible. The hearsay rule "prohibits the use of a person's assertion, as equivalent to testimony to the fact asserted, unless the asserter is brought to testify in court on the stand, where he may be probed and cross-examined as to the grounds of his assertion and of his qualifications

to make it." *Stone v. Insurance Co.,* 106 Colo. 522, 107 P. (2d) 241.

From another standpoint the reception of Gray's testimony concerning the conversations at the two meetings cannot be made the means of securing a reversal of the judgment. The conversation at the first meeting consisted of a statement that she knew something was radically wrong with her and that her condition was the subject of talk throughout the hospital (matters not in dispute as shown by her serious illness after the first operation; her visitation by a number of doctors, some of whom were called in consultation by Dr. Davis; and her precarious condition requiring a second operation); her questions put to Gray and his refusal to reveal to her anything concerning what happened; all of which added nothing testimonial in quality; hence, assuming the charge that it was hearsay, its admission was harmless error. *Alamo Hotel & Garage Co. v. Toledo Scale Co.,* 71 Colo. 577, 208 Pac. 476. As to the second meeting, the matter there related was testified to by him in connection with what was removed from plaintiff's abdomen as part of the proof in support of the allegation that a sponge was enclosed in her person at the first operation. Under such circumstances this testimony could have no prejudicial effect. Where questioned evidence is established by other and proper evidence to the same or similar effect, error, if any, in the admission of the questioned evidence is harmless. *Capitol Livestock Insurance Co. v. Campion,* 71 Colo. 156, 204 Pac. 604.

Assertion of prejudicial error in the refusal to admit a letter in evidence is strongly pressed by defendants. We detail the circumstances under which it was presented in order that the propriety of the trial court's action may be understood, and our resolution of the problem better comprehended.

Gray was being cross-examined concerning his qualifications as a graduate nurse and as to his training. His application for a nurse's position with the hospital in

which the surgery on the plaintiff was performed was used as the springboard for this interrogation. He made admissions in this cross-examination showing that the information which he gave in his application was not true. Counsel for the defendants then confronted him with a letter written to them, at their solicitation, from one of the institutions in which he said he had received some of his training, advising the attorneys that he had not received such training. Be it remembered that he had admitted that he had not received such training and that this admission was before the jury. Defendants sought to have the letter admitted in evidence on the basis that it was a statement adopted by him. An objection to its admission was sustained.

 There are reasons why the trial court acted properly in the premises. If it was sought thereby to show the falsity of his statements in his application for a nurse's position with the hospital, it was an attempt at impeachment on a collateral matter. The letter, inconsistent with the information given in the application, was not admissible for any purpose independent of the contradiction existing between it and the application; consequently, it related to a collateral fact. "The rule is well recognized that a witness can be contradicted only upon some matter that is material or relevant to some issue in the case. It is not always easy to determine when matter thus sought to be contradicted is collateral, and it must generally be determined from the facts of the particular case. A test which appears to contain all the elements of the rule is found in Attorney General v. Hitchcock, 1 Exch. 99, and is thus stated: 'Could the fact, as to which the prior self-contradiction is predicated, have been shown in evidence for any purpose independent of the self-contradiction?' Whether Payne shot Carman maliciously or accidentally, or whether he had said that he had shot him in self-defense, was not material or relevant to any issue in the prosecution of Sweeney for the crime of which he was charged, and

could not have been offered for any purpose independent of self-contradiction. These facts being collateral to any issue in the case on trial, the court very properly refused to allow an issue to be made of them." *State v. Sweeney,* 75 Kan. 265, 88 Pac. 1078. See also *Askew v. People,* 23 Colo. 446, 48 Pac. 524; *Dillard v. U. S.,* 141 Fed. 303; *Coles v. Harsch,* 129 Ore. 11, 276 Pac. 248.

Moreover, admission of falsity of the statements in the application was before the jury; hence, the letter would add not one cubit to the proof of self-contradiction.

The defendants maintain that the case should never have been submitted to the jury, on the theory that much of Gray's testimony was discredited and he was a key witness for the plaintiff, and that there was clear and convincing evidence produced by the defense to the effect that no sponge was left in the abdominal cavity of the plaintiff. On this question we apply the rule set forth in 88 C.J.S. 492, § 214: "The rule that the credibility of the witness presents a question for the jury applies notwithstanding the credibility of the witness is questioned, or his testimony was given under such circumstances as would naturally throw discredit on him. It is for the jury to determine the credibility of a witness whose testimony has been impeached or how far his credibility is affected thereby."

Although "great latitude is allowed in the introduction of evidence to aid in determining the extent of damages; and as a broad general rule any evidence which tends to establish the nature, character, and extent of injuries which are the natural and proximate consequences of defendant's acts is admissible in such actions, if otherwise competent," 25 C.J.S. 794, § 146, still there must be some connection between injury and damages. Evidence of treatment and attendant suffering from unrelated conditions and the expense incidental thereto was received over objection. Particularly is this true of the surgery performed by Dr. McLauthlin and

the expenses in connection therewith, and of treatment by Dr. Ashmun. In assessing damages the jury may well have considered the by-products of pain and suffering arising from her condition and the ministrations of these doctors. Plaintiff sought to establish cause and effect by saying, "Everything that is the matter with me now is because they left that pack in me." Expert testimony was to the contrary.

 Evidence of surgery, of treatment, of expenses relating thereto, of pain and suffering attendant thereupon, or of other matters in connection therewith, when not shown to be the natural and proximate result of the injury, or not tending to so show, is inadmissible. The asserted consequences must be linked to the injury; otherwise, there is presented to the jury evidence of unrelated conditions and circumstances wholly prejudicial to the party against whom such evidence is being introduced.

An instruction was given concerning the defense of the statute of limitations. In the event of a re-trial, this instruction should be amended because it, at least implicitly, assumes the presence of a sponge in the abdomen of the plaintiff. The instruction should be so framed as to leave it to the jury to ascertain if a sponge had been left in her abdomen. Although no objection was made to this instruction based upon this point, error in this respect should not be repeated in a new trial.

The judgment is reversed and the cause remanded with directions to grant a new trial.

Mr. Chief Justice Moore, Mr. Justice Holland, and Mr. Justice Day dissent.

Mr. Justice Day dissenting.

I agree that the verdict of the jury and judgment of the trial court entered thereon must be reversed. I dissent, however, from the majority opinion in ordering a new trial, being firmly convinced that the action should

be dismissed. The majority, in my opinion, has fallen into two serious errors. First, the opinion in effect repeals the statute of limitations. Second, it emasculates the provisions of Rule 8, relating to the pleading and answering of affirmative claims or defenses.

I am opposed to judicial repeals of legislative enactments, and the majority opinion in effect repeals the two-year statute of limitations (C.R.S. '53, 87-1-6) which reads as follows:

"Action barred in two years. — No person shall be permitted to maintain an action, whether such action sound in tort or implied contract, to recover damages from any person licensed to practice medicine, chiropractic, osteopathy, chiropody, midwifery or dentistry on account of the alleged negligence of such person in the practice of the profession for which he is licensed or on account of his failure to possess or exercise that degree of skill which he actually or impliedly represented, promised or agreed that he did possess and would exercise, unless such action be instituted within two years after such cause of action accrued."

The majority opinion holding that this statute is not controlling under the circumstances disclosed by the record here, impales the defendants on the horns of a dilemma encompassed in a vicious circle. This I will demonstrate later in discussing the evidence.

I also dissent from the novel interpretation placed upon the Rules of Civil Procedure. The majority opinion has attempted to give effect to Rule 8 (d) without consideration of 8 (c). It would limit 8 (c) to averments in an *answer* only, whereas the rule in fact establishes mandatory procedure *"in pleading to a preceding pleading."* Rule 8 (c) reads:

*"In pleading to a preceding pleading,* a party *shall set forth affirmatively* accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of con-

sideration, *fraud,* illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver *and any other matter constituting an avoidance* or affirmative defense. Any mitigating circumstances to reduce the amount of damages shall be affirmatively pleaded. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation." (Emphasis supplied.)

A careful reading of this rule makes it quite plain that it is not limited to matters pleaded in an answer to a complaint but applies to any preceding pleading. The rule was intended to follow the old code practice making it necessary to file a reply when a preceding pleading (the answer in this case) presenting affirmative matter requires "confession and avoidance."

Rule 9 (b) provides for averments of fraud to be stated with particularity, and this is true whether the fraud is averred in the complaint; set up as an affirmative defense in an answer, or pleaded in a reply. It is obvious from reading Rule 8 (c) that the *first sentence* of 8 (d) and not the second (as quoted in the majority opinion) is prevailing here. Rule 8 (d) reads as follows:

"Effect of Failure to Deny. *Averments in a pleading to which a responsive pleading is required,* other than those as to the amount of damage, *are admitted when not denied in the responsive pleading.* Averments in a pleading to which no responsive pleading is required or permitted shall be taken as denied or avoided." (Emphasis supplied.)

As applied to this case, the proper pleadings should have been as follows:

(a) The complaint alleges negligent malpractice;

(b) The answer affirmatively sets up the statute of limitations (and this requires a responsive pleading);

(c) A reply should have been filed pleading avoidance on the ground of fraudulent concealment, the cir-

cumstances of which should have been averred with particularity.

To permit amendment of the complaint was error since such arguments anticipated the defense. It compounds the error, in my opinion, for the majority to hold that the necessary affirmative matter in avoidance is automatically in the case by operation of the rule.

I proceed next to a consideration of the evidence, or lack of it. For the plaintiff to excuse herself in failing to bring the action within the time required by the statute, it was incumbent upon her to *prove* by a preponderance of the *evidence that she was ignorant of the fact that she had a cause of action against the defendants.* Further, she must establish that such ignorance was due to the fraudulent concealment of the defendants. The fault in the majority opinion arises from the premise that fraud was injected into the case by operation of the rule rather than by particular averment. How can defendants be expected to meet the issue of fraud at the trial without having been charged therewith by affirmative pleading? And if fraud is pleaded as a mere legal conclusion (as by the amendment to the complaint in this case), how does a defendant meet it without knowledge of the particular acts charged as constituting concealment? The harm is apparent when consideration is given to the record.

An examination of plaintiff's evidence reveals a concerted effort on her part to convince the jury of her complete and superior knowledge of the facts constituting negligence on the part of the defendants for the purpose of establishing their liability, but total ignorance of such facts as they relate to the alleged cause of action for the purpose of meeting the bar of the statute of limitations. Plaintiff was examined at great length in her case in chief on her own experience and knowledge as a nurse. She not only testified to complete familiarity with this particular operating room and all of its supplies but related that as she entered the operating room

she made a complete survey of all the various packs within reach of the nurses and surgeons for the operation to be performed upon her. With this background and minute description of the packs present in the operating room before the operation, the plaintiff testified on direct examination that some four or five days after the operation she noticed a lump on her abdomen and that nothing would go past it. The following questions and answers were elicited from the plaintiff:

"Q. About what size was it, Mrs. Bonebrake? A. Well, I remembered that as it came up here, it would be something like this (witness indicating). Q. About the size of a partially opened fist? A. Yes. Q. What general confirmation did it have, or present on the skin area? A. Well, it seemed like — well, as I remember it — I told you I was very sick, and my abdomen of course was distended. And as I remembered I just remembered it as a sort of a kind of a squarish or sort of rectangular — I can't describe it just exactly. I just remembered that this was my first complaint that there was a lump there. *There is something there.* (Emphasis supplied.) * * * Q. Could you feel it? A. Yes, that is the way that it was (witness indicating).

On cross examination the following testimony was elicited from the plaintiff:

"Q. Now, you thought it was foreign object of some kind, didn't you Mrs. Bonebrake? A. Well, I didn't think you could grow something just that fast, Mr. Wagner. Q. The answer would be 'Yes, you did think it was a foreign object of some kind.' A. I don't remember of saying it was a foreign object. I mean, I didn't make acquisitions [sic] to anyone. I didn't call Dr. Davis and say 'Yes, you left something in me. You come and take it out,' because at the time I really had a lot of faith in Dr. Davis, or I wouldn't have gone to him. Q. But you believe that it was not something that was part of you, is that correct? A. Well, I felt — I mean — *there was*

*something there. That was my thought,* Mr. Wagner." (Emphasis supplied.)

Further portions of plaintiff's deposition taken before the trial indicate these questions and answers:

"Q. What did you think was found in you then prior to that second time you saw Melvin Gray? A. Well, I *knew* there was something the matter with me. I *knew* they had left some *scissors* in me, *a pack in me,* cut my guts open great big, all swollen up here. * * * Q. *Did you ever say anything to them about your thought that perhaps there was a foreign body in there? A. I certainly did. Q. You did?* A. Yes. Q. Which one and when? A. I talked to both of them. I talked to everybody that came in the room about that thing there." (Emphasis supplied.)

It will be noted from the portions of the record quoted — and there are other questions and answers of a similar nature — that the plaintiff had reason to believe that the defendant doctors had been negligent in the performance of the first operation. *With that knowledge,* if she had a cause of action and if her testimony could be believed, *it accrued then and there.* Plaintiff's counsel, at the time the complaint was amended, stated to the trial court that they were attempting to include allegations which would bring them within the case of *Rosane v. Senger,* 112 Colo. 363, 149 P. (2d) 372. Counsel also rely upon that case in their brief in this court. That was an action for the negligent leaving of a gauze pad within the abdomen, but there are many distinguishing features that make the case inapplicable here. There a motion to dismiss on the pleadings on behalf of the doctors was made. The cause had not progressed to trial. In making such motion defendants admitted all of the allegations of the complaint that were well pleaded. Plaintiff Rosane's complaint alleged she had been diligent in her efforts to obtain confirmation as to the cause of her complaints and that the doctors had concealed the true cause from her; that she did not discover the facts

until an operation ten years later when the gauze pad was removed. The pleadings, if sustained by the evidence, would have met the bar of the statute of limitations, and it was held error to dismiss the action on the pleadings that the court should have permitted the case to go to trial.

In the case before us all of the evidence was before the court. It was obvious on the record made that the plaintiff was not ignorant of her cause of action. Further there was no evidence that the defendants had attempted to conceal anything from her. Plaintiff states that she talked to the defendants and to everybody else who came into the room about something being left in her. Plaintiff knew personally virtually every member of the staff of the hospital, including the nurses, attendants and interns. She had access to the X-rays that were taken of her between the first and second operations. Almost a year to the day of the operation she made a visit to Central City to see the male nurse Gray, who had been in attendance at the operation. At that time she did not obtain the evidence she was seeking. It is apparent that the plaintiff was not, on that occasion, seeking to determine whether she *had* a cause of action, but whether she could obtain corroborating evidence which she believed would bolster her own story and be more convincing than her own account of the "squarish" or "rectangular" object which she *saw* and *observed* under the skin of her abdomen. In *Rosane v. Senger, supra,* it is said (page 370):

"It has been held that while generally, plaintiff's ignorance of the wrong committed can not be considered in determining when the statute begins to run, an exception to this rule is made in cases of the concealment of the cause of action. There the bar of the statute does not operate until discovery, * * *."

If this be the rule, and I believe that it is, it applies with compelling force to the facts here. Plaintiff was

not ignorant of the cause of her distress, but knew and proclaimed to any one who would listen that she believed the doctors had done her an injury and knew with exactitude when it had been done. Her difficulty was not in the knowledge of the injury, but in the proof to establish it.

Other authorities on the subject in harmony with our views in *Rosane v. Senger, supra,* are:

54 C.J.S. 143, sec. 174:

"Cause of action accrues on the date of the wrongful act or omission constituting the malpractice, and limitations run from that time and not from the date of the damage caused unless the physician has been guilty of fraudulent concealment. This rule has been applied notwithstanding the full extent of the injury is not then developed."

*Goodall Co. v. Martin,* 141 F. (2d) 435:

"True it is, the statute of limitations runs against a cause of action from the time of the original injury and not from the date of ensuant damage."

Plaintiff also relies on a California malpractice case, *Huysman v. Kirsch,* 6 Cal. (2d) 302, 57 P. (2d) 908, but we believe that case to be against plaintiff for on page 912 of the Pacific Reporter the California court holds:

" * * * The negligence occurred thereafter, by reason of the surgeon neglecting to remove the tube left in the patient's wound after it had served its purpose. This negligence continued during the entire time the tube was left in the body of the patient, and only ended upon the removal of said tube. * * * cannot this court now hold that the surgeon's negligence continued up to the removal of said tube, and that the appellants' cause of action then accrued and would not be barred until one year thereafter? Such is the holding of this court * * *."

Applying the above reasoning to the case at bar, it is established that an obstruction about which plaintiff complained was removed on September 4. Under *Huys-*

*man v. Kirsch, supra,* the cause of action accrued on that date and would be barred in two years.

Now let us examine whether or not the statute was tolled by actions of the defendant amounting to concealment from the plaintiff as to the *true nature* of her injuries. There is not one scintilla of evidence in the record of any attempt on the part of these defendants, or any one else, to keep anything from this plaintiff. The majority opinion in effect holds that the refusal of the doctors to admit the charges being preferred against them by this plaintiff during the days that she was in the hospital and subsequently is evidence of concealment. This record shows that when this plaintiff left the hospital she immediately consulted another doctor and underwent another operation within a couple of weeks after her discharge from the hospital by these defendants. At that time she was dissatisfied with them and refused to pay them. She refused to believe that the second operation was occasioned by a paralysis of the ileum, commonly known as "ileus." Dr. McLaughlin, who performed the third operation and who testified at the trial, confirmed what had been done in the second operation because he could see the recent surgery that had been performed.

The majority opinion states that the doctors at all times had refused to tell Mrs. Bonebrake the reason for the second operation. This assertion is not borne out in the record. On direct examination Mrs. Bonebrake was asked the following questions and gave the following answers:

"Q. I will withdraw that and ask if you discussed any reasons concerning the second operation or any reasons why you had to have it with Dr. Gutherie in the presence of either Dr. Davis or Dr. Niehouse, or both, do you remember? A. Not right now, I can't think. Q. Would you relate any conversations with Dr. Gutherie. Did you ever ask Dr. Gutherie *what reason compelled the doctor to operate on you the second time?* A. Yes, I did.

Q. You did ask them? A. Yes. Q. Without stating what he said, did he give you a reply? A. Yes, he did.".

In another portion of the record, on cross examination, Mrs. Bonebrake was asked the following questions and gave the following answers:

"Q. Just a moment. You haven't answered the question. Please don't volunteer. Let me go back to this: if you like, I could take it one by one on these doctors. During the period in question did Dr. Gutherie ever refuse to discuss your case with you? A. Now, which period were you talking about? Q. The same period between August 17, 1951, and September 4, 1951. A. Well, Dr. Gutherie, you see, didn't see me until just a few days before the September operation. Q. Yes, but in that time did he ever refuse to discuss your condition with you? A. No."

At still another portion of the record we have these questions and answers by the plaintiff:

"Q. What did Dr. Niehouse say to you if anything? A. Dr. Niehouse told me on the day I left the hospital — he discharged me from Rocky Mountain — he told me that I should go and see a kidney specialist or come to see him about twice a year for an examination of a right ureter because they had severed the ureter in surgery — that I might have some scar tissue which would ruin or destroy the right kidney. I should go and have that examination for that purpose."

It will be noted from those portions of the record from the testimony of plaintiff herself and from the testimony of the doctors which need not be quoted here, that the doctors did not refuse to discuss the matter with Mrs. Bonebrake. They did, however, refuse to assent to her accusations that they had left a foreign object in her person. If that amounts to evidence of fraudulent concealment, then the horns of the dilemma are apparent. This is a classic example of a person being "damned if he does or damned if he doesn't." If the doctor admitted the accusation he has averted the charge of conceal-

ment but he has "hung himself" on his own admissions. If he steadfastly denies the accusations, this according to the majority opinion, is concealment. All of the so-called evidence of concealment was perfectly consistent with the position of the defense; that the doctors had done no wrong to plaintiff and had operated on her a second time for a common post-operative complication caused by shock after the first operation. It is a settled principle of law in negligence cases that whenever the evidence is consistent with either the existence or non-existence of negligence the matter should not be left to the jury. *Bishop v. Brown,* 14 Colo. App. 535, 61 Pac. 50. The reasoning would apply with equal force to evidence consistent with the position taken by the defendants.

It is true that in some circumstances silence alone can amount to concealment — for example, failure to disclose defects in a building or some other material matter in a transaction — but in a case such as that before us, fraudulent concealment would of necessity require some overt act or acts on the part of the doctors. We must keep in mind that this operation was viewed by three doctors, a scrub nurse, who testified for the plaintiff, and another nurse. The substance removed from the person of Mrs. Bonebrake, which the doctors contend was tissue, was taken by a nurse in a pan to a laboratory, and was examined by a laboratory technician. A complete description of the operation in narrative form was written up by one of the doctors. Hospital records and charts had to be kept. To constitute concealment would require evidence of a conspiracy between the three doctors whereby they pledged each other to secrecy and agreed to withhold knowledge from plaintiff.

It is strange that the evidence of the male nurse, Gray — vague and containing mere opinions and conclusions — fails to disclose any action or conduct of the doctors

534

which would substantiate the charge of concealment. There was no evidence of an occasion where something was said by or among the doctors, and to Gray and the other nurse as to the confidential nature of the so-called finding of the gauze pack. I cannot believe that without a nod or a word between any of the actors at the scene of the operation a pack could be removed, placed in a pan, taken to a laboratory and disposed of in some mysterious manner, without some outward sign or reaction on the part of those present. Nor can I believe the "talkative" witness Gray would stand silently in that operating room and not say a word about what he had "seen." The doctors say nothing to him. Neither he nor the nurse commented to each other; no word is sent to the laboratory and no word comes back from the laboratory. How can this be? It would seem that there would also have to be evidence of forgery of the operating room report, forgery and suppression of the laboratory report, substitution of X-ray plates which did not show any foreign object in the abdomen, and other overt acts too numerous to mention. The record is plain that as a former employee of the hospital Mrs. Bonebrake was free to talk to all members of the staff and had access to all of the records, none of which were ever denied her.

The record discloses that she was attended by Dr. Radetsky, Dr. Sadar, Dr. Mill, Dr. Henry, Dr. Garland, Dr. Al Perry, Dr. Thompson, Dr. Martin, Dr. Tyler, Dr. Miller, Dr. Fairbanks, in addition to the defendants and a Dr. Good, who was a medical consultant. She had an opportunity to discuss her complaints and condition and obtain information concerning her condition from all of these persons. There is no evidence that their silence was procured by these defendants, or that they were in fact silent. They discussed her true ailments with plaintiff. If silence alone, or denial of wrongdoing, is concealment, then the doctors in this case are indeed enmeshed in a web of new legal doctrine, where silence is

affirmation of an accusation, and denial is proof of the fact denied.

Another statement in the majority opinion appalls me. The opinion states:

"At best plaintiff's testimony as to the presence of a foreign body cannot arise above that of the conjecture of a non-observer of the event."

The opinion goes further and says that:

"The law makes such testimony (as that of the plaintiff) valueless and incompetent."

If such is the law, the jury was not given an instruction on the point nor were they instructed that plaintiff's testimony was mere conjecture. We have several hundred folios of testimony by Mrs. Bonebrake which was certainly intended to imprint in the minds of the jury a firm conviction that there was a foreign object in her person, the outline of which she could see and the presence of which she could feel internally as well by outward pressure. It cannot be said that the jury did not predicate its verdicts upon her testimony, as much or more than upon Gray's, which was vague and hazy and which in my opinion was completely discredited. Mrs. Bonebrake was positive in her assertions and every effort was made to give credence to her testimony by a lengthy examination as to her qualifications as a nurse. For this Court to say that her testimony was "valueless," "incompetent" and "cannot arise above that of conjecture" without instructions to the trial court that on retrial her testimony be disallowed, or that she be allowed to testify only as to her pain and suffering, will compound error.

I am convinced that the evidence above related does not remove the bar of the statute of limitations, either by competent proof of the lack of knowledge on the part of the plaintiff of her cause of action or by competent proof that the defendants had done one thing designed or intended to keep her in the dark. The motion to dismiss the case at the close of plaintiff's evidence on the

536

plea of the statute of limitations should have been sustained and should be a complete bar to any new trial.

As to the views herein expressed on the interpretation of Rule 8, MR. CHIEF JUSTICE MOORE and MR. JUSTICE HOLLAND join therein.