CITY OF AURORA, COLORADO, and the City of Colorado Springs, Colorado, Plaintiffs-Appellants,

v.

BECHTEL CORPORATION, Defendant-Appellee.

No. 77–1858.

United States Court of Appeals, Tenth Circuit.

Submitted March 13, 1979.

Decided May 29, 1979.

Louis Johnson of Horn, Anderson & Johnson, Colorado Springs, Colo. (Leland M. Coulter, City Atty. and Louise L. Edmonds, Asst. City Atty., Aurora, Colo., on the brief), for plaintiffs-appellants.

Charles H. Haines, Jr., Denver, Colo. (Gary L. Holdeman, Denver, Colo., on the brief), of Grant, McHendrie, Haines & Crouse, Denver, Colo., for defendant-appellee.

Before McWILLIAMS, BARRETT, Circuit Judges, and MILLER, Judge, United States Court of Customs and Patent Appeals.*

BARRETT, Circuit Judge.

The Cities of Aurora and Colorado Springs, Colorado (Cities) appeal a grant of summary judgment in favor of Bechtel Corporation (Bechtel) based upon the bar of the statute of limitations. Jurisdiction vests by reason of diversity.

In the early 1950s, growth along the front range of the Colorado Rockies began to increase at a significant rate. As the population grew, the need for water also increased. This influx of population resulted in the formulation of various water diversion projects whereby water could be transported from the western slope of the

---

* Of Washington, D. C., sitting by designation.

Continental Divide of the Rocky Mountains to the more populated front range area. One such project was known as the Homestake Project.

The Homestake Project consisted of a series of watershed facilities which could collect water on the upper reaches of the Homestake Creek for storage in a reservoir located near Leadville, Colorado, at an altitude of approximately 10,000 feet. The water from this reservoir would then be transported through the Homestake Tunnel from the western slope of the Continental Divide to the eastern slope where it would be eventually stored in reservoirs located near the Cities of Aurora and Colorado Springs.

Initial ground work, in the form of geological studies, for the project began in the mid–1950s. A general adjudication of the water rights for the project was completed in 1961. *See: Metropolitan Suburban Water Users Association v. Colorado River Water Conservation District*, 148 Colo. 173, 365 P.2d 273 (1961). Following this adjudication, the Cities acquired the interests of others and entered into an agreement with a view toward sharing the water and the costs of construction and operation of the project.

In July of 1962, the Cities entered into a contract with Bechtel whereby Bechtel agreed to provide design engineering services and construction supervision for the project. Following Bechtel's preparation of the plans and specifications, a contract for construction of the Homestake Tunnel was let by the Cities to Smith-Quad Construction, a joint venture.

Actual construction of the tunnel began in September of 1963, with final completion in September of 1966. Water began flowing through the tunnel in 1967.

The tunnel itself is approximately five and one-half miles in length and is substantially unlined. The upstream portal of the tunnel is located at an elevation of approximately 10,040 feet, some 220 feet below the high water line of the Homestake Reservoir. The downstream portal of the tunnel lies at an elevation of 9,936 feet at the Lake

Fork of the Arkansas River just slightly upstream from Turquoise Lake. Flow of water through the tunnel is regulated by means of a series of slide gates and dispersion valves. Normally, when water is flowing through the tunnel, a cone dispersion valve, located at the downstream portal, is used to regulate the quantity of water being discharged. When water is not being transported to reservoirs on the eastern slope, both a hydraulic slide gate, located at the intake portal, and a butterfly valve, located at the downstream portal, are closed. In the event that it is necessary to gain access to the tunnel for inspection or repair work, the butterfly valve is opened, while leaving the slide gate closed, so that water can drain from the tunnel. Once the water is drained, it is possible to gain access to the tunnel through a 24 inch manhole located immediately upstream from the cone dispersion valve.

In February, 1974, the superintendent of the Homestake Project was instructed to increase the flow of water through the tunnel from 50 cubic feet per second (cfs) to approximately 153 cfs. On February 22, 1974, the cone dispersion valve was opened to its maximum but a flow of only 80 cfs was obtained. The actual capacity of the tunnel, under normal conditions, is approximately 600 cfs.

Between February and June of 1974, various attempts were made to determine whether the flow reduction resulted from a malfunction of the hydraulic system at the intake slide gate, similar to one which occurred in 1968. Unfortunately, severe winter weather conditions and the need to drain the Homestake Reservoir for the expected spring run-off hindered inspection of the tunnel. Finally, on June 5th and 6th, 1974, the Cities were able to conduct tests on the hydraulic slide gate. The "[u]pstream gate was operated over [a] full range to assure that the gate was not the cause of the fluctuation. Tests pointed almost conclusively to a cave-in, as [the] gate appeared to be operating normally." [R., Vol. I, p. 81.] Preparations were made to enter the tunnel through the inspection

manhole, located at the downstream portal, in order to determine the existence of blockages within the tunnel.

On June 18, 1974, a cave-in was observed approximately 10,100 feet inside the tunnel. It was determined, however, that this blockage was not of a sufficient magnitude to cause a reduction in flow to 80 cfs. Eventually, six other tunnel blockages were observed, one of which, discovered October 6, 1974, completely blocked the tunnel.

On June 29, 1976, the Cities filed suit against Bechtel alleging negligence and breach of implied warranties in the design, engineering and supervision of the project. The first claim for relief, based upon breach of implied warranties, was dismissed for failure to state a claim on which relief could be granted. Bechtel then moved for summary judgment on the remaining claim for relief contending that it was barred by the statute of limitations. Following the pleadings, depositions and memorandums of the parties, and after hearing argument on the matter, the district court granted Bechtel's motion for summary judgment holding that the two-year statute of limitations contained in 13–80–127(1), C.R.S.1973[1] applied and that the claim for relief arose on June 18, 1974 when there was "an *awareness* of the existence of damage and the possibility that negligence [was] involved." (Emphasis supplied.) [R., Vol. I, p. 149.] A timely notice of appeal was filed on behalf of the Cities.

Following the district court's grant of summary judgment and the Cities' filing of their notice of appeal, the Supreme Court of Colorado handed down two opinions which held, in essence, that the special two-year statute of limitations found in 13–80–127(1), C.R.S.1973, on which the district court relied, *does not apply to claims for damages for deficiencies in the structure itself. See: Duncan v. Schuster-Graham Homes, Inc.*, 578 P.2d 637 (Colo.1978); *Tamblyn v. Mickey & Fox, Inc.*, 578 P.2d 641 (Colo.1978). In so holding, the Supreme Court stated that an action for damages for deficiencies in a structure is covered by the general six-year statute of limitations found in 13–80–110, C.R.S.1973.[2]

---

1. 13–80–127(1), C.R.S.1973 provides:

13–80–127. Limitation of actions against architects, contractors, engineers, and inspectors. (1) All actions against any architect, contractor, engineer or inspector brought to recover damages for injury to person or property caused by the design, planning, supervision, inspection, construction, or observation of construction of any improvement to real property shall be brought within two years after the claim for relief arises, and not thereafter, but in no case shall such an action be brought more than ten years after the substantial completion of the improvement to the real property, except as provided in subsection (2) of this section.

(2) In case such injury to person or property occurs during the tenth year after substantial completion of the improvement to real property, said action shall be brought within one year after the date upon which said injury occurred.

(3) Nothing in this section shall be construed as extending the period or periods provided by the laws of Colorado or by agreement of the parties for bringing any action, nor shall this section be construed as creating any cause of action not existing or recognized on or before June 1, 1969.

(4) The limitations provided by this section shall not be asserted as a defense by any person in actual possession or control as owner, tenant, or otherwise of such an improvement at the time any deficiency in such an improve-

ment constituted the proximate cause of the injury for which it is proposed to bring an action.

(5) For the purposes of this section, "substantial completion" means that degree of completion of an improvement to real property at which the owner can conveniently utilize the improvement for the purpose for which it was intended.

Source: L. 69, p. 697, § 1; C.R.S.1963, 1969 Perm.Supp. § 87–1–28.

2. 13–80–110, C.R.S.1973 provides:

13–80–110. Actions barred in six years. (1) Except as otherwise provided in section 4–2–725, C.R.S.1973, the following actions shall be commenced within six years after the cause of action accrues, and not afterwards:

(a) All actions of debt founded upon any contract or liability in action;

(b) All actions upon judgments rendered in any court not being a court of record;

(c) All actions for arrears of rent;

(d) All actions of assumpsit, or on the case founded on any contract or liability, express or implied;

(e) All actions of waste and for trespass upon land;

(f) All actions of replevin, and all other actions for taking, detaining, or injuring goods or chattels;

In both *Duncan* and *Tamblyn*, the plaintiffs filed their complaints within six years of the date they purchased their homes. Thus, the court was not faced with, and did not decide, the question of when a cause of action accrues for purposes of 13–80–110, C.R.S.1973. In the instant case, however, construction of the Homestake Tunnel was completed on September 30, 1966 and the Cities began using it to transport water in the Spring of 1967. Inasmuch as the complaint was not filed until June 29, 1976, more than six years from the date the Cities began using the tunnel, the question presented is: When does an action predicated upon engineering malpractice accrue for purposes of the six-year statute of limitations found in 13–80–110, C.R.S.1973?

### I.

■ We have not found, and the parties have not presented us with, any controlling Colorado law on the subject. Neither *Duncan* nor *Tamblyn* discuss the issue. We are, therefore, faced with a situation where we must attempt to construe the law of the State of Colorado in the manner in which the Supreme Court of Colorado would, if faced with the same facts and issue. *See: Burgert v. Tietjens*, 499 F.2d 1 (10th Cir. 1974); *Symons v. Mueller Company*, 493 F.2d 972 (10th Cir. 1974); *Cottonwood Mall Shopping Center, Inc. v. Utah Power & Light Company*, 440 F.2d 36 (10th Cir. 1971), *cert. denied*, 404 U.S. 857, 92 S.Ct. 107, 30 L.Ed.2d 99 (1971). In so doing, we may look to all resources, including decisions of other states, as well as Colorado and federal decisions, and to the general weight and trend of authority. *In re Birdseye*, 548 F.2d 321 (10th Cir. 1977); *Julander v. Ford Motor Company*, 488 F.2d 839 (10th Cir. 1973); *Cottonwood Mall Shopping Center, Inc. v. Utah Power & Light Company, supra*. Dicta or holdings in analogous state court decisions, while not authoritative expressions of the law of Colorado, are persuasive and entitled to consideration by

this court. *Estate of Goldstein v. CIR*, 479 F.2d 813 (10th Cir. 1973). Of course, the views of the federal district judge in a diversity case, who is a resident of the state where the controversy arose, interpretive of a state's laws carry extraordinary force on appeal where there are no controlling state decisions providing clear precedent. *Rasmussen Drilling v. Kerr-McGee Nuclear Corporation*, 571 F.2d 1144 (10th Cir. 1978), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978).

In determining when a cause of action accrues for engineering malpractice based upon alleged design deficiencies in a structure, the courts have taken three approaches.

The traditional approach, and the approach urged by Bechtel, holds that the cause of action accrues upon "completion of construction and acceptance of the improvement by the owner." [Supplemental Brief of Bechtel, pp. 12–13.] Cases applying this approach do so on the grounds that an architect or engineer has the power, at any time, during the progress of the project to correct a defect in the work and, when the engineer or architect turns over the completed project to the owner with the design defect, there is then an actual breach of his duty of care. These opinions seem to rely on the long-standing rule that a cause of action in contract accrues at the time of breach, and that even when the cause of action is brought in tort, the tort duties arise from the contract and are therefore breached in accordance with contract rules. *See: South Burlington School District v. Goodrich*, 135 Vt. 601, 382 A.2d 220 (1977); *Sears, Roebuck & Company v. Enco Associates, Inc.*, 43 N.Y.2d 389, 401 N.Y.S.2d 767, 372 N.E.2d 555 (1977); *Comptroller of Virginia v. King*, 217 Va. 751, 232 S.E.2d 895 (1977); *M. T. Reed Construction Company v. Jackson Plating Company*, 222 So.2d 838 (Miss.1969); *Wellston Company v. Sam N. Hodges, Jr. & Company*, 114 Ga.App. 424,

(g) All other actions on the case, except actions for slander and for libel.

Source: R.S. p. 438, § 1; G.L. § 1671; G.S. § 2163; R.S. 08, § 4061; C.L. § 6392; CSA, C. 102, § 1; CRS 53, § 87-1-11; C.R.S.1963, § 87-1-11; L. 65, p. 1481, § 4.

151 S.E.2d 481 (1966); *Wills v. Black and West, Architects*, 344 P.2d 581 (Okl.1959).

Bechtel contends that the Colorado Supreme Court applied this rule in *Pueblo v. Mace*, 132 Colo. 89, 285 P.2d 596 (1955). We agree that the court stated, in dicta, that a claim for relief based upon the faulty construction of an adjoining land owner's structure accrues following the completion of construction. That, however, is not the holding of the case. Rather, the holding of the case is that recovery may be had for all damages accruing during the statutory period prior to the commencement of an action for a continuing trespass, although, a recovery for damages previous to that period may be barred. The factual situation in *Pueblo* is not in any way analogous to the situation we are faced with. Moreover, the case has never been cited in any other opinion for the proposition advanced by Bechtel. Under such circumstances, we do not feel that the holding in *Pueblo* is "pinpoint" law or controlling for purposes of this action. We, therefore, decline Bechtel's invitation to rely on it.

The second approach taken by the courts holds that the statute of limitations begins to run and the cause of action accrues when *significant* damage occurs. *See: Oakes v. McCarthy Co.*, 267 Cal.App.2d 231, 73 Cal. Rptr. 127 (1968). In *Oakes*, a homeowner in a subdivision filed suit against the soil engineer for damage caused by soil settlement. The court held that the applicable statute of limitations was the three-year statute for negligent damage to real property and that the statute commenced to run when *appreciable* damage resulted rather than when the first hairline cracks in the soil appeared. Arguably, the Colorado appellate courts applied this rule in *Doyle v. Linn*, 37 Colo.App. 214, 547 P.2d 257 (1975).

The third rule, and that urged by the Cities, holds that the statute of limitations begins to run when the injured party discovers, or should have discovered in the exercise of reasonable diligence, that the damage or injury has occurred and that it has probably resulted from malpractice on the part of the engineer. Under this rule, some damage is enough—substantial damage is not necessary.

This "discovery rule" was first applied in medical malpractice suits. *See:* 80•A.L. R.2d 368 (1961). Colorado adopted the rule in medical malpractice cases nearly 35 years ago. *See: Rosane v. Senger*, 112 Colo. 363, 149 P.2d 372 (1944). In *Rosane*, the court stressed that statutes of limitations were "enacted for the purpose of promoting justice, discouraging unnecessary delay and forestalling the prosecution of stale claims, not for the benefit of the negligent." The court stated, emphatically, that such statutes "should not be construed to defeat justice." *Rosane v. Senger, supra*, 149 P.2d at 375. *See also: Klamm Shell v. Berg*, 165 Colo. 540, 441 P.2d 10 (1968). The *Rosane* case was followed in *Davis v. Bonebrake*, 135 Colo. 506, 313 P.2d 982 (1975). Both the *Rosane* and *Davis* opinions appeared to limit the discovery rule to actions in which the negligent party fraudulently attempted to conceal negligence or damage.

However, in *Owens v. Brochner*, 172 Colo. 525, 474 P.2d 603 (1974), the Supreme Court of Colorado specifically extended the discovery rule to cases where there was no concealment of negligence or damage by the defendant:

> There is no difference, in our view, as far as the wronged plaintiff is concerned, whether the negligence of the defendants was *concealed* or for some *other* valid cause the plaintiff failed to learn of the negligence, unless, of course, the plaintiff, in the exercise of reasonable diligence, should have known of the negligence at the time of its occurrence.

474 P.2d, at 605.

In reaching its decision that "in a professional negligence case the cause of action 'accrues' when the patient discovers or, in the exercise of reasonable diligence, should have discovered the doctor's negligence" [*Owens v. Brochner*, 474 P.2d, at 607], the court stated:

> ". . . *To say that a cause of action accrues to a person when she may maintain an action thereon and, at the same time, that it accrues before she has or can*

*reasonably be expected to have knowledge of any wrong inflicted upon her is patently inconsistent and unrealistic. She cannot maintain an action before she knows she has one. To say to one who has been wronged, 'You had a remedy, but before the wrong was ascertainable to you, the law stripped you of your remedy,' makes a mockery of the law.* [Citations.] (Emphasis supplied.)

There are a number of reasons why the word 'accrued' should be equated with the 'discovery rule'; first, the injustice of barring the plaintiff's action before he could reasonably have been aware that he had a claim is patent.

' * * * In many cases he will or should know at the time of or soon after the wrongful act that he has been a victim of negligent medical care; in other settings of fact it may be impossible for him, as a layman, unskilled in medicine, reasonably to understand or appreciate that actionable harm has been done to him. If this is fairly the fact, we think he should have the statutory time from the moment of discovery, the moment he knows or should know he has a cause of action, within which to sue.' [Citations.]

\* \* \* \* \* \*

Second, in balancing the equities between the doctor and the patient, we feel that the burden placed on the doctor is much less than the great injustice the patient would suffer. As the Supreme Court of Hawaii stated, in *Yoshizaki v. Hilo Hospital,* 50 Haw. 150, 433 P.2d 220,

' * * * We realize that added burdens are placed on defendants by forcing them to defend claims with evidence that may be stale. We should not overlook the fact that the plaintiff must produce evidence sufficient to establish a prima facie case before the defendant is obliged to produce any evidence . . . .' "

474 P.2d, at p. 606.

The *Owens* case was subsequently followed in *Nitka v. Bell,* 29 Colo.App. 504, 487 P.2d 379 (1971); *Valenzuela v. Mercy Hosp.,* 34 Colo.App. 5, 521 P.2d 1287 (1974); *Sanchez v. Valley View Hosp.,* 521 P.2d 1290 (Colo.App.1974); and *Short v. Downes,* 36 Colo.App. 109, 537 P.2d 754 (1975).

The emergent trend seems to indicate that the discovery rule will be applied to other actions against professionals. *Accountants: Chisholm v. Scott,* 86 N.M. 707, 526 P.2d 1300 (1974); *Moonie v. Lynch,* 256 Cal.App. 361, 64 Cal.Rptr. 55 (1967); *Atkins v. Crosland,* 417 S.W.2d 150 (Tex.1967). *Attorneys: Niedermeyer v. Dusenbery,* 275 Or. 83, 549 P.2d 1111 (1976); *McKee v. Riordan,* 116 N.H. 729, 366 A.2d 472 (1976); *Hendrickson v. Sears,* 365 Mass. 83, 310 N.E.2d 131 (1974); *Kohler v. Woollen, Brown and Hawkins,* 15 Ill.App.3d 455, 304 N.E.2d 677 (1973); *Neel v. Magana, Olney, Levy, Cathcart and Gelfand,* 6 Cal.3d 176, 98 Cal.Rptr. 837, 491 P.2d 421 (1971); *Mumford v. Staton, Whaley and Price,* 254 Md. 697, 255 A.2d 359 (1969). *Dentists: Phelps v. Donaldson,* 243 La. 1118, 150 So.2d 35 (1963); *Faith v. Erhart,* 52 Cal.App.2d 228, 126 P.2d 151 (1942). *Insurance Agents: Gazija v. Nicholas Jerns Company,* 86 Wash.2d 215, 543 P.2d 338 (1975); *United States Liability Insurance v. Haidinger-Hayes, Inc.,* 1 Cal.3d 586, 83 Cal.Rptr. 418, 463 P.2d 770 (1970).

Several courts have already applied the "discovery rule" to architects and engineers. *See: Kundahl v. Barnett,* 5 Wash.App. 227, 486 P.2d 1164 (1971); *Banner v. Town of Dayton,* 474 P.2d 300 (Wyo.1970); *Steelworkers Holding Company v. Menefee,* 255 Md. 440, 258 A.2d 177 (1969); *New Market Poultry Farms, Inc. v. Fellows,* 51 N.J. 419, 241 A.2d 633 (1968); *Chrischilles v. Griswold,* 260 Iowa 453, 150 N.W.2d 94 (1967); Annotation, 90 A.L.R.3d 507 (1979). The Colorado Court of Appeals has also applied the discovery rule to architects, engineers and surveyors, in actions brought under the two-year statute of limitations found in 13–80–127(1) C.R.S.1973. *See: Tamblyn v. Mickey & Fox, Inc.,* 568 P.2d 491 (Colo.App. 1977), reversed on other grounds, *Tamblyn v. Mickey & Fox, Inc., supra; Greene v. Green Acres Construction Company,* 36 Colo.App. 439, 543 P.2d 108 (1975); *Housing*

*Authority of Town of Limon v. Leo A. Daly Company*, 35 Colo.App. 244, 533 P.2d 937 (1975), as did the District Court in this case. [R., Vol. I, p. 149.]

 After a comprehensive review of the general weight and trend of the decisions, including those Colorado decisions bearing on the subject, we are of the view that the reasons for delayed accrual in actions for malpractice apply as much to the engineering and architectural profession as to others. In the first place, the professional engineer or architect, like other professionals, owes a special duty to his client to perform his services with "that degree of knowledge, skill and judgment, ordinarily possessed by members of that profession, and to perform faithfully and diligently any service undertaken as an architect in the manner a reasonably prudent architect would under the same or similar circumstances." Colorado Jury Instructions 15:13; *Perlmutter v. Flickinger*, 520 P.2d 596 (Colo.App.1974). The inability of a layman to recognize design deficiencies in structures, even though patent, underscores this responsibility. If a layman must immediately ascertain whether the structure was properly designed and engineered, he must call in consulting experts prior to the acceptance of a project. This is patently unreasonable.

Secondly, the layman may not only be unable to recognize a patent design deficiency, but oftentimes, such design and engineering deficiencies will be latent in nature. The deficiency may be concealed in a wall or, literally, buried in the earth.

Thirdly, the added burdens placed upon defendants simply do not outweigh the interests of providing an injured plaintiff with a forum. While the passage of time may burden a defendant's ability to defend, it must be remembered that the plaintiff ultimately bears the burden of proof. *See: Owens v. Brochner, supra*, 474 P.2d at 606.

Finally, the application of a discovery rule in engineering and architectural malpractice suits does not frustrate the policies underlying the statute of limitations where the injured party does not, and in the exercise of reasonable diligence, could not have known of his claim prior to its discovery. *See: Owens v. Brochner, supra*, 474 P.2d at 606.

We, therefore, hold that in an action for professional malpractice against an engineer or architect brought under the six-year statute of limitations contained in 13–80–110, C.R.S.1973, the cause of action does not accrue until the plaintiff knows, or should know, in the exercise of reasonable diligence, all material facts essential to show the elements of that cause of action. Of course, the question of whether or not the plaintiff actually discovered, or should have discovered, that damage occurred and that it probably resulted from professional malpractice is a question which should be left for the trier of fact or, in appropriate cases, summary judgment.

In light of our holding, we deem it necessary to remand this cause to the district court to determine, either through trial, or, if appropriate, other proceedings, whether the claim is barred by the six-year statute of limitations. We, of course, do not express any opinion as to the merits.

Reversed and remanded for further proceedings consistent with the views expressed herein.