**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**March 25, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff – Appellant/Cross-
    Appellee,

v.

GEORGE BADGER; LAJUANA
BADGER; SB TRUST; DAVID
BADGER, as Trustee for the SB Trust;
ARDCO LEASING & INVESTMENT,
LLC; AMERICAN RESOURCES AND
DEVELOPMENT COMPANY, INC.;
SPRINGFIELD FINANCE AND
MORTGAGE COMPANY, LLC,

    Defendants – Appellees/Cross-
    Appellants.

Nos. 14-4110, 14-4119

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:10-CV-00935-RJS)**

---

Robert D. Kamenshine, Appellate Staff, Civil Division, (Benjamin C. Mizer, Principal
Deputy Assistant Attorney General, Joyce R. Branda, Acting Assistant Attorney General,
Carlie Christensen, United States Attorney, and Leonard Schaitman, Appellate Staff,
Civil Division with him on the briefs) United States Department of Justice, Washington,
D.C. for Appellant/Cross Appellee.

Shawn D. Turner, Turner & Stamos, (Stephen W. Cook, Cook & Monahan, with him on
the briefs) Salt Lake City, Utah for the Appellees/Cross-Appellants.

Before **LUCERO**, **HARTZ**, and **GORSUCH**, Circuit Judges.

**HARTZ**, Circuit Judge.

In 2004 the Securities and Exchange Commission (SEC) entered into a stipulated judgment with George Badger enjoining him from various activities and requiring him to pay $19.2 million (the Consent Judgment). The government has recovered only $6,548. It seeks a declaration that American Resources and Development, Inc. (ARDCO), Springfield Finance and Mortgage Company, LLC (Springfield), SB Trust, and ARDCO Leasing & Investment, LLC (ARDCO Leasing) (collectively, Defendants) are Badger's alter egos so that their assets can be pursued to satisfy the Consent Judgment. The claim bears a similarity to claims invoking the well-known doctrine under which a court can "pierce the veil" of a corporate entity and hold an individual liable for what on its face is a corporate debt. *See, e.g.*, *NLRB v. Greater Kan. City Roofing*, 2 F.3d 1047, 1051–52 (10th Cir. 1993). But the claim here is a "reverse-piercing" claim because it seeks to hold a corporation (or like entity) liable for the debt of an individual. *See Floyd v. IRS*, 151 F.3d 1295, 1298 (10th Cir. 1998).

The United States District Court for the District of Utah granted summary judgment for Defendants, ruling that the government's reverse-piercing alter-ego theory is not available under Utah law. Exercising jurisdiction under 28 U.S.C. § 1291, we hold

2

that Utah law recognizes the theory. We also reject Defendants' alternative ground for affirmance—that the claim is governed by the Federal Debt Collection Procedures Act and is therefore barred as untimely—because the Act does not apply to this action to enforce a disgorgement order. We reverse and remand for further proceedings.

## I. BACKGROUND

The government appeals only the district court's ruling that it cannot proceed on its reverse-piercing alter-ego theory.[1] The court essentially ruled that the government had failed to state a claim, regardless of the truth of its allegations. For the purposes of this appeal, we therefore take the allegations of the government's complaint (the Complaint) as true, *see Gee v. Pacheco*, 627 F.3d 1178, 1183 (10th Cir. 2010), even though Defendants contest them. To provide background to this litigation, we can also take judicial notice of court proceedings. *See id.* at 1186.

The Consent Judgment arose out of unlawful conduct by Badger in fraudulently creating demand for securities issued by Golf Ventures, Inc. (GVI). To create a market for GVI stock in the early 1990s, Badger, a GVI executive, bribed brokers to promote GVI shares. Badger pleaded guilty in 1997 to several offenses, including the use of manipulative and deceptive devices in connection with the sale of a security, *see* 15 U.S.C. § 78j. GVI ultimately went bankrupt.

Badger profited from the scheme to inflate GVI's stock price as a GVI executive

---

[1] The government also claimed that Defendants were Badger's nominees. But the district court granted summary judgment in favor of Defendants on those claims. The government does not appeal this ruling.

3

and investor in ARDCO, which was GVI's largest shareholder. After his guilty plea, the SEC sued him, seeking, among other things, disgorgement of his profits and payment of a civil penalty for his offenses.

In 2004 Badger agreed to a $19.2 million judgment comprising disgorgement of $5.8 million of profits from his securities fraud, $7.7 million in prejudgment interest, and a $5.8 million civil penalty. Our focus is on disgorgement. That remedy "consists of factfinding by a district court to determine the amount of money acquired through wrongdoing—a process sometimes called 'accounting'—and an order compelling the wrongdoer to pay that amount plus interest to the court." *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006). When the government pursues injunctive relief against one who has violated a statute protecting the public interest, it often also obtains an order to disgorge the unlawful profits from the wrongdoing. *See, e.g.*, *Porter v. Warner Holding Co.*, 328 U.S. 395, 397–400 (1946). "[S]ince the public interest is involved . . . , [the court's] equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Id.* at 398; *see SEC v. Rind*, 991 F.2d 1486, 1491 (9th Cir. 1993) (SEC suit to enforce securities laws, including seeking disgorgement of illicit profits, "vindicates public rights and furthers the public interest"). Disgorgement aids enforcement by making violations unprofitable, thereby deterring future violations. *See Porter*, 328 U.S. at 400 ("Future compliance may be more definitely assured if one is compelled to restore one's illegal gains . . . ."); *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997) ("The primary purpose of disgorgement orders is to deter violations of

4

the securities laws by depriving violators of their ill-gotten gains."); *Rind*, 991 F.2d at 1491 ("The effective enforcement of the federal securities laws requires that the [SEC] be able to make violations unprofitable." (internal quotation mark omitted)). For that reason, we have distinguished such disgorgement orders from judgments that are intended only to compensate victims for their losses. *See Usery v. Fisher*, 565 F.2d 137, 139 (10th Cir. 1977) (consent-judgment order directing employer not to withhold past-due wages owed under Fair Labor Standards Act was "purely equitable in nature, not a money judgment," so employer could be held in contempt and imprisoned for failure to pay); *cf. Fischbach Corp.*, 133 F.3d at 175 (victim compensation is a "distinctly secondary goal" of disgorgement orders in securities-fraud cases); *Rind*, 991 F.2d at 1491 (use of disgorgement proceeds to compensate victims "does not detract from the public nature of [SEC] enforcement actions").

As of July 2010, the government had recovered only $6,548—$2,228 paid voluntarily and $4,320 paid through deductions from Badger's social security payments and tax refunds. In December 2010 the district court held him in civil contempt for failing to make reasonable efforts to pay the amounts required by the Consent Judgment. The government seeks to increase its puny recovery by collecting from various entities that it claims are alter egos of Badger. Its theory is that Badger has been able to frustrate collection of the Consent Judgment by using Defendants to hide his assets through a series of convoluted transactions. The Complaint describes Defendants and their activities as follows:

5

### A. ARDCO and Springfield

ARDCO, a Utah corporation, owns Springfield, a limited liability company, which conducts ARDCO's only business—investing. Badger's former son-in-law, Thomas Stamos, is the nominal president of ARDCO; but ARDCO, Springfield, and their property are controlled by Badger, who uses them to hide assets. Badger manages the investing activities: he opened all of Springfield's investment accounts, monitors the accounts, handles their day-to-day activities, and transfers money into and out of them. He had power of attorney over these accounts until 2009, when the SEC issued a subpoena to ARDCO in its efforts to collect on the Consent Judgment. When the government brought this action, both ARDCO and Springfield were operated out of Badger's home.

Of particular interest is ARDCO's relationship with GVI. ARDCO was GVI's largest shareholder. After GVI went bankrupt, an entity associated with Badger called Springfield Investment purchased property in St. George, Utah, from the bankruptcy estate. Springfield Investment later sold ARDCO its subsidiary Springfield, which developed the real estate. At the end of the development, Springfield had about $2 million in cash, which it invested in the commodity-futures market. Its investments were still worth about $2 million when the suit against Defendants was filed.

### B. SB Trust

SB Trust, an irrevocable trust for the Badgers' children, was created by Badger and his wife on June 30, 1998, after he pleaded guilty to his criminal charges and the

SEC brought its civil action. Badger's son David is the named trustee. The trust was initially funded with ARDCO shares. In 2005, after the Consent Judgment, Badger's wife (to whom Badger had previously gifted his interest) donated the family home to SB Trust, although the Badgers deduct mortgage interest and other home expenses on their personal income-tax forms. The trust assets now include the family home, a building lot, cash, and a commodity trading account. As of December 31, 2008, the value of these assets exceeded $1.1 million.

SB Trust and its assets are controlled by Badger. He performs accounting work for the trust, holds himself out as managing agent for the trust's investment accounts, handles day-to-day account activity, and works with advisors to make investment decisions. Although Badger's son is the nominal trustee, Badger has managed the affairs of the trust without his son's knowledge or input. The trust pays much of Badger's personal living expenses and has paid at least $75,000 directly to him and his wife. In addition, the trust and ARDCO loaned $500,000 to Mrs. Badger, who has no financial expertise, to invest in the commodity-futures market. A trading account was opened in her name, but Badger has "actively monitored this account, transferred money into and out of the account, communicated with the brokers on the account, and performed all the day-to-day administrative tasks for the account." Aplt. App., Vol. I at 23–24 (Complaint ¶ 21). None of the $500,000 loan has been repaid, even though the investments have earned hundreds of thousands of dollars.

7

### C. ARDCO Leasing

ARDCO Leasing, a limited liability company, provides a car for Badger's personal use. It purchased the car with over $20,000 received from Badger's home-equity line of credit. Although ARDCO Leasing is purportedly owned by Mrs. Badger and the Badgers' son David, Badger has operated it out of his home.

Defendants dispute the government's allegations. But the district court did not need to resolve the dispute because it ruled the government's legal theory invalid.

## II.   DISCUSSION

### A. Alter Ego / Reverse Piercing

The government contends that the district court erred in dismissing its alter-ego claim. The legal doctrine on which it relies is sometimes called "reverse piercing." Under the related well-established practice of piercing the corporate veil, "the corporate form will be disregarded and the personal assets of a controlling shareholder or shareholders may be attached in order to satisfy the debts and liabilities of the corporation." *Greater Kan. City Roofing*, 2 F.3d at 1051. Under reverse piercing, in contrast, a corporation or other entity can be liable for the debt of someone who controls the entity. *See Floyd*, 151 F.3d at 1298 (in reverse piercing, "corporate assets [are used] to satisfy the obligations of an individual stockholder"). The parties do not dispute that Utah law governs the issue. *See Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1561, 1575–76 n.18 (10th Cir. Feb. 16, 1990). The district court held that Utah law does not recognize reverse piercing. We review de novo this state-law issue. *See Devery*

8

*Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 727 (10th Cir. 1991) ("In exercising *de novo* review we afford no deference to the district court's interpretation of state law.").

There is no holding by the Utah Supreme Court on whether Utah would recognize a reverse-piercing claim, so our task is to predict how it would rule. *See, e.g.*, *Flores v. Monumental Life Ins. Co.*, 620 F.3d 1248, 1250 (10th Cir. 2010) ("As a federal court sitting in diversity, our task is simply to ascertain and apply Oklahoma law, attempting to predict what the state's highest court would do if faced with the specific issues before us on appeal." (internal quotation marks omitted)). *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1574 (10th Cir. 1984) ("In the absence . . . of an authoritative pronouncement from the state's highest court, our task is . . . predicting how the state's highest court would rule."); *Gomez v. Am. Elec. Power Serv. Corp.*, 726 F.2d 649, 652 (10th Cir. 1984); *Herndon v. Seven Bar Flying Serv., Inc.*, 716 F.2d 1322, 1332 (10th Cir. 1983); *City of Aurora v. Bechtel Corp.*, 599 F.2d 382, 386 (10th Cir. 1979) ("We have not found, and the parties have not presented us with, any controlling Colorado law on the subject. . . . [T]herefore . . . we must attempt to construe the law of the State of Colorado in the manner in which the Supreme Court of Colorado would, if faced with the same facts and issue.").

Two sources that are persuasive in the task of predicting state law are precedential decisions by a state's intermediate appellate courts, *see Daitom*, 741 F.2d at 1574 ("This court must . . . follow any intermediate state court decision unless other authority convinces us that the state supreme court would decide otherwise."), and dictum by its

9

highest court, *see City of Aurora*, 599 F.2d at 386 ("Dicta or holdings in analogous state court decisions, while not authoritative expressions of [state law], are persuasive and entitled to consideration by this court."). We are ordinarily bound, however, by our own precedent interpreting a state's law. *See Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1231 (10th Cir. 2000) ("Following the doctrine of *stare decisis*, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law.").

This circuit has one relevant precedent. In *Cascade*, a Utah diversity case, we refused to apply reverse piercing to hold several corporations liable for the controlling shareholder's actions in assisting a related corporation to violate its fiduciary duties to the plaintiffs. *See* 896 F.2d at 1576–78. For several reasons, however, we are not bound by that precedent to reject the government's claim in this case. To begin with, when *Cascade* was filed, there were no statements by the Utah Supreme Court that would support a reverse-piercing claim. *Cf. id.* at 1576–77 ("[I]t is far from clear that Utah has adopted the doctrine of 'reverse' piercing, much less this particular variant of 'reverse piercing.'"). We noted that the sole mention of the doctrine by the Utah Supreme Court described it as a "'little-recognized theory.'" *Id.* at 1577 (quoting *Messick v. PHD Trucking Serv., Inc.*, 678 P.2d 791, 793 (Utah 1984)). As we will discuss shortly, there is now substantial support. Also, *Cascade* noted three features of the case before it that argued against reverse piercing, and these features do not appear to be significantly present here: (1) The corporations sought to be held liable had innocent shareholders.

10

*See Cascade*, 896 F.2d at 1562, 1577. (2) The liability arose out of a "voluntary and contractual" relationship, which enabled the victims to protect themselves from loss through guarantees or security agreements. *See id.* at 1577. And (3) an essential feature of all veil-piercing was absent; the plaintiffs had not shown that "recognition of the corporate form would sanction a fraud, promote injustice, or produce an inequitable result." *Id.* at 1578 (brackets and internal quotation marks omitted). We said that "the mere existence of [a corporation's] limited liability" would not suffice. *Id.* As a result, we expressed reluctance to recognize reverse piercing as a theory of liability in that case, stating:

> *Absent a clear statement by the Supreme Court of Utah* that it has adopted the variant reverse piercing theory urged upon us here, *we are inclined to conclude* that more traditional theories of conversion, fraudulent conveyance of assets, respondeat superior and agency law are adequate to deal with situations where one seeks to recover from a corporation for the wrongful conduct committed by a controlling stockholder without the necessity to invent a new theory of liability.

*Id.* at 1577 (emphasis added).

Defendants suggest that *Cascade* prohibits us from recognizing reverse piercing in Utah unless the Utah Supreme Court expressly applies it in a decision. But they read too much into an "inclin[ation]" in that case. *Id.* The panel did not purport to (and could not) reverse our precedents imposing on the court the duty to predict how the Utah Supreme Court would rule. *See, e.g.*, *Daitom*, 741 F.2d at 1574; *Gomez*, 726 F.2d at 652; *Herndon*, 716 F.2d at 1332; *City of Aurora*, 599 F.2d at 386. None of these cases say that we can adopt a doctrine only if the state's highest court has endorsed it in a "clear

11

statement." And consistent with our precedents, *Cascade* reached its conclusion only after carefully analyzing state law for the reasons why "a Utah court would not reverse pierce the entity veils" in that case. *See* 896 F.2d at 1576. Further, even if we read *Cascade* as holding that there are no circumstances in which Utah law would recognize reverse piercing, this circuit recognizes that such a precedent can be overruled by later "declaration[s] to the contrary by that state's courts," *Koch*, 203 F.3d at 1231. That is the circumstance here.

Less than three weeks after *Cascade*, the Utah Supreme Court expressed sympathy for reverse piercing, saying that it "follows logically from the basic premise of the alter ego rule and appears consistent with our case law." *Transamerica Cash Reserve, Inc. v. Dixie Power & Water, Inc.*, 789 P.2d 24, 26 (1990). Nevertheless, it said that even if it recognized the doctrine, it would not apply to that case. Transamerica had sued Dixie Power & Water, Inc. and Darrell Hafen "to recover monies Hafen allegedly obtained from Transamerica via a series of fraudulent transactions." *Id.* at 25. Transamerica moved for a prejudgment writ of attachment against Dixie's deposits at First Security Bank. *See id.* The court said that Transamerica had not shown "that the corporation itself played a role in the inequitable conduct at issue." *Id.* at 26. It explained:

> Dixie was not involved in Hafen's scheme, and none of Dixie's assets, including the money on deposit with First Security, was obtained as a result of Hafen's fraudulent activities. In fact, Dixie's funds on deposit at First Security were the proceeds of a legitimate sale of water rights owned by Dixie.
> . . . .
> [T]he test is not met simply because a trial court finds that [the corporate] form would in some way prevent a creditor of a controlling shareholder

12

from quickly being made whole. The inequity contemplated by the second requirement of the alter ego test is not present just because the existence of the corporate form is inconvenient for a creditor seeking to pursue the shareholder's assets; it is not enough for the creditor to complain that it must proceed against the shareholder's assets, including the stock in the corporation, rather than simply levying on the corporation's assets.

*Id.* at 25–26. In that case, "Transamerica did not rely on the existence of Dixie in its dealings with Hafen, and the money in Dixie's bank account was entirely unrelated to Hafen's Transamerica activities." *Id.* at 26. We cannot say that the facts alleged by the government in this case establish a similar innocence of Defendants.

We recognize that the *Transamerica* statement of sympathy for reverse piercing is not a holding. But it is a "declaration." *Koch*, 203 F.3d at 1231. If the state court were rejecting reverse piercing as a theory of recovery, its detailed analysis of the facts of the case would have been unnecessary. And there are further indications of Utah judicial support for the application of alter-ego doctrine in the reverse-piercing context.

For example, in *Jones & Trevor Mktg., Inc. v. Lowry*, 284 P.3d 630, 635–37 (Utah 2012), the Utah Supreme Court adopted a list of nonexclusive factors set forth in *Colman v. Colman*, 743 P.2d 782, 786 (Utah Ct. App. 1987), to consider when applying the alter-ego doctrine. Although *Lowry* was a traditional veil-piercing case, *Colman* involved reverse piercing, *see Colman*, 743 P.2d at 786–88 (corporation was defendant's alter ego and its assets were thus subject to court distribution in divorce). Yet *Lowry* apparently thought that point was not worth mentioning. This makes sense if the issue is only whether two parties are alter egos, regardless of which is to be held liable for the other's debts.

13

Also supportive is the apparent adoption of reverse piercing by the Utah Court of Appeals. After *Colman* and our opinion in *Cascade*, that court has twice applied the alter-ego theory in the reverse-piercing context: *Envirotech Corp. v. Callahan*, 872 P.2d 487, 499 (Utah Ct. App. 1994) and *Watson v. Watson*, 837 P.2d 1, 5 (Utah Ct. App. 1992). Although *Watson* perhaps can be discounted somewhat because it involved the division of property in a divorce proceeding, where the court has enhanced equitable powers, *see Stroud v. Stroud*, 758 P.2d 905, 906 (Utah 1988) ("[C]ourts have broad equitable powers to generally adjust financial and property interests to meet the ends of justice and the problems often faced in domestic relations cases . . . ."), *Envirotech* applied the alter-ego doctrine in a context like ours. After losing a bench trial, the defendant formed a corporation, C–H Industries, Inc. (C–H) (with his wife as sole shareholder and president), and transferred assets into it without compensation to avoid paying the *Envirotech* judgment. *See* 872 P.2d at 489–91. The district court found that C–H was the defendant's alter ego and therefore the defendant could be ordered to transfer all its assets to the plaintiff; and the court of appeals affirmed. *See id.* at 499. Badger attempts to distinguish *Envirotech* as applying "ordinary alter ego law (not reverse piercing)." Aplee. Br. at 27. But it cannot be denied that *Envirotech* applied accepted Utah alter-ego principles to justify what amounted to reverse piercing. The court did what the government seeks here.

These Utah precedents are not definitive. There is yet to be a holding by the Utah Supreme Court applying the alter-ego doctrine in a reverse-piercing context. But the

14

post-*Cascade* opinions by Utah appellate courts persuade us that Utah may apply reverse piercing in the context of this case. And we do not think that we are improperly departing from *Cascade* in light of the more recent Utah opinions and the important apparent factual differences between *Cascade* and this case.[2]

Defendants argue that even if we recognize the availability of reverse piercing in general, there are alternative grounds that prevent the government from pursuing the theory. First, they argue that an alter-ego claim is procedural, not substantive, and that "there is no substantive claim for relief upon which an alter ego claim may attach," so our ruling on the claim would be an improper advisory opinion. Aplee. Br. at 35. The argument perplexes us. If the government's argument prevails, it will be able to pursue collection efforts against Defendants. That is no inconsequential, abstract matter. A decision in the government's favor would have "real-world consequences." *Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1379 (10th Cir. 2011); *see Hewitt v. Helms*, 482 U.S. 755, 761 (1987) ("The real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff*."). That suffices for issuance of a declaratory judgment. *See Columbian Fin. Corp.*, 650 F.3d at 1376 ("The question comes down to whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between

---

[2] Earlier this week the Utah Supreme Court again rejected a reverse-piercing claim. *See M.J. v. Wisan*, 2016 UT 13. But the court emphatically stated that it recognizes the doctrine. See *id*. at ¶¶ 71–84.

parties having adverse legal interests, *of sufficient immediacy and reality* to warrant the issuance of a declaratory judgment." (internal quotation marks omitted)).

Second, Defendants argue that a trust cannot be subject to reverse piercing. But the criteria for applying the alter-ego theory do not suggest such an exception, nor do we discern why one should be recognized. One can attempt to improperly escape a payment responsibility using any manner of entity, regardless of the formal connection between the two alter egos. *See United States v. Vernon*, 2016 WL 502835, at *7 (10th Cir. Feb. 9, 2016) ("[W]here . . . a non-owner is allowed by the nominal owner to dominate and control the corporation at issue, the corporation can be treated as the non-owner's alter ego."); *United States v. Scherping*, 187 F.3d 796, 802 (8th Cir. 1999) (trust was the taxpayers' alter ego because it was a "sham entit[y] created on behalf of and used by taxpayers to evade payment of their federal income tax liabilities"). Badger cites no contrary authority. We believe that Utah courts would apply alter-ego doctrine to trusts.[3]

Defendants' third argument has some merit but is premature. They contend that the application of reverse piercing would be inappropriate on the facts of this case. They argue, for example, that corporate formalities were observed, that the third-party entities played no part in Badger's wrongdoing, and that innocent shareholders would be impacted if the district court were to apply reverse piercing. These arguments, however, were not addressed by the district court, which did not reach the factual sufficiency of the alter-ego claim. They should be addressed in the first instance by the district court on

---

[3] This view is confirmed by *Wisan* at ¶ 78.

16

remand.

## B. The Federal Debt Collection Procedures Act

As an alternative ground for affirmance, Defendants argue that the government's action was time-barred under the Federal Debt Collection Procedures Act (FDCPA), 28 U.S.C. § 3001 *et seq.* (1990).[4]  The government concedes that if the FDCPA is applicable, the present action would be time-barred.  But it contends that its action seeking an alter-ego declaration is not governed by the FDCPA.  The issue is one of statutory interpretation, so our review is de novo.  *See United States v. Quarrell*, 310 F.3d 664, 669 (10th Cir. 2002).

Congress passed the FDCPA to facilitate debt collection by the United States.  *See* Seth S. Katz, *Federal Debt Collection Under the Federal Debt Collection Procedures Act:  The Preemption of State Real Estate Laws*, 46 Emory L.J. 1697, 1699 (1997).  Before the FDCPA's enactment, the government's collection efforts "proceeded in the same manner as any other creditor pursuant to the law of the state where the judgment was issued."  *Id.*  Because the government had been so ineffective in collecting billions of dollars under a multitude of different state laws, "the Department of Justice successfully argued to Congress that it could no longer efficiently collect outstanding federal debts without a uniform federal debt collection law."  *Id.* at 1699.  In response the FDCPA

---

[4] Defendants raise the issue in a cross-appeal; but a cross-appeal is not the proper course for seeking to affirm when the party requests no greater relief than that provided by the judgment below.  *See Whitehead v. Okla. Gas & Elec. Co.*, 187 F.3d 1184, 1189 n.4 (10th Cir. 1999) ("A cross appeal is unnecessary to advance an argument to affirm the decision appealed . . . .").

creates "a comprehensive, uniform statutory framework for the collection of federal debts." *Id.* at 1699.

The FDCPA "provides the exclusive civil procedures for the United States—(1) to recover a judgment on a debt; or (2) to obtain, before judgment on a claim for a debt, a remedy in connection with such claim." 28 U.S.C. § 3001(a). As prejudgment remedies, the government may obtain a writ of attachment, *see id.* § 3102; appointment of a receiver, *see id.* § 3103; a writ of garnishment, *see id.* § 3104; or a writ of sequestration, *see id.* § 3105. As postjudgment remedies, the government may obtain a judgment lien, *see id.* § 3201; a writ of execution, *see id.* § 3203; an installment-payment order, *see id.* § 3204; or a writ of garnishment, *see id.* § 3205. A separate subchapter of the FDCPA also allows the government to obtain relief against a fraudulent transfer. *See id.* § 3301–08.

But the FDCPA does "not apply with respect to an amount owing that is not a debt or to a claim for an amount owing that is not a debt." *Id.* § 3001(c). The pertinent part of the FDCPA definition of *debt* is:

> (B) an amount that is owing to the United States on account of a fee, duty, lease, rent, service, sale of real or personal property, overpayment, fine, assessment, penalty, restitution, damages, interest, tax, bail bond forfeiture, reimbursement, recovery of a cost incurred by the United States, or other source of indebtedness to the United States, but that is not owing under the terms of a contract originally entered into by only persons other than the United States . . . .

*Id.* § 3002(3). The government argues that a disgorgement order is not a debt, so the FDCPA does not govern this suit. It relies on two decisions by the Fifth Circuit: *SEC v.*

18

*Huffman*, 996 F.2d 800 (5th Cir. 1993), and *SEC v. AMX, Int'l., Inc.*, 7 F.3d 71 (5th Cir. 1993).

In *Huffman* the SEC had filed civil lawsuits against a number of defendants who consented to orders to pay disgorgement, while reserving their ability to contest the disgorgement amount based on inability to pay. *See* 996 F.2d at 801. After the consent orders were entered, the defendants claimed they could not pay. *See id.* at 801–02. The district court reduced the disgorgement amounts because of various state-law exemptions. *See id.* at 802. The government appealed, arguing that the defendants were not entitled to the exemptions (which would be recognized under the FDCPA, *see* 28 U.S.C. § 3014(a)(2)) because the statute does not apply to disgorgement. *See Huffman*, 996 F.2d at 802. The Fifth Circuit accepted, as the parties assumed, that the amount the defendants were ordered to pay was disgorgement (rather than a settlement amount). *See id.* at 801 n.1. It then noted that the FDCPA's definition of "debt" does not explicitly include disgorgement. *See id.* at 802; *see also* 28 U.S.C. § 3002(3). Although the defendants argued that disgorgement could be considered either "restitution" or an "other source of indebtedness to the United States," both of which fall under the FDCPA definition of *debt*, the court rejected both arguments. *See Huffman*, 996 F.2d at 802–03 (internal quotation marks omitted). It held that disgorgement was not restitution because "[i]t is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs. Disgorgement does not aim to compensate the victims of the wrongful acts, as restitution does." *Id.* at 802. And it held that disgorgement was not an "other source of

19

indebtedness to the United States" because "disgorgement is more like a continuing injunction in the public interest than a debt." *Id.* at 803 (internal quotation marks omitted).

*AMX* addressed the issue that was not contested by the parties in *Huffman*: "whether a disgorgement order entered as a result of a settlement between the parties, in which no liability is admitted or determined, operates as a 'debt' for purposes of the [FDCPA]." *AMX*, *Int'l*, 7 F.3d at 75. In *AMX* the defendant settled with the SEC but did not stipulate to an amount. *See id.* at 72. After the parties could not agree to an amount, the district court ordered the defendant to pay disgorgement of $218,610. *See id.* at 72–73. The defendant failed to comply, arguing that he did not have the means to pay. *See id.* at 73. The district court determined that the defendant's only meaningful asset (his home) was exempt from collection under the FDCPA. *See id.* at 73. The SEC appealed, arguing that, as in *Huffman*, the disgorgement order was not subject to the FDCPA. *See id.* at 74. The defendant responded that because the disgorgement order resulted from a settlement agreement, it met the FDCPA's definition of a debt. *See id.* at 75. But the Fifth Circuit disagreed, refusing "to distinguish between disgorgement orders which are entered as the result of a consent decree and those resulting from a full adversary proceeding." *Id.* at 76. It held that "the underlying agreement supporting the disgorgement order did not transform the obligation into a 'debt' for purposes of the [FDCPA]." *Id.*; *cf. Usery v. Fisher*, 565 F.2d 137, 138–39 (10th Cir. 1977) (consent-judgment order directing employer not to withhold past-due wages owed under Fair

20

Labor Standards Act was "purely equitable in nature, not a money judgment").

Defendants do not challenge the holdings in *Huffman* and *AMX*, so we will follow that law for purposes of this appeal. *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) (adopting parties' assumption of applicable law). But in attempting to distinguish *AMX* they ignore what it held. We quote their argument in full:

> Appellees do not dispute that a disgorgement order rendered in an original SEC action is not considered a debt under the FDCPA. *E.g. S.E.C. v. AMX, Inc.*, 7 F.3d 71 (5th Cir. 1993). A disgorgement order is an "ancillary remedy" available to the SEC under SEC law in original actions and is enforced through the contempt power of the court including incarceration. "Disgorgement is not precisely restitution; it wrests ill-gotten gains from the hands of a wrongdoer. (Citation omitted). It is this feature, the similarity to an injunction, which allows disgorgement orders, unlike judgments, to be enforced by civil contempt." *SEC v. Solow*, 682 F. Supp. 2d 1312, 1325 (S.D. Fla. 2010), citing *SEC v. Huffman*, 996 F.2d 800, 802-803 (5th Cir. 1993). No question exi[s]ts that the SEC could have joined Appellees in its original action to recover any alleged ill-gotten gains allegedly placed into their accounts. *See SEC v. Ross*, 504 F.3d 1130 (9th Cir. 2007) (regarding the proper resolution of claims against a third party allegedly holding ill-gotten gains from a wrongdoer).
>
> *Here*, however, *the SEC is not attempting to enforce a disgorgement order. Rather, USA is attempting to satisfy its money judgment rendered in the Consent Judgment*. Subchapter C of the FDCPA provides the exclusive procedure for the United States' post-judgment remedies in collecting a money judgment. In this case, jurisdiction is not based upon the Securities and Exchange Act, but upon 28 U.S.C. § 1345. Here, USA is not seeking ancillary relief under 15 U.S.C. § 78u(d) and (e) of the Securities and Exchange Act and is not invoking the Court's equitable power of contempt in order to force disgorgement. This is an action based upon a money judgment. SEC's original action against Badger for disgorgement was reduced to a specific amount and, "Once a claim is reduced to judgment, the original claim is extinguished and merged into the judgment; and a new claim, called a judgment debt, arises." *Soc'y of Loyds, v. Reinhart*, 402 F.3d 982, 1004 (10th Cir. 2005) (citing *Restatement of Judgments*, § 47).

Aplee. Br. at 42–44 (emphasis added) (footnotes omitted).

21

As we understand it, what this argument boils down to is the assertion that the government is not enforcing a disgorgement order but a money judgment because the amount owed has been settled in a judgment. But that argument was rejected in *AMX*, in which the amount owed was also set forth in a judgment. Under Fifth Circuit law the FDCPA would not apply to this case. The government here, as in *AMX*, seeks enforcement of a consent judgment containing a disgorgement order. The Consent Judgment provides for disgorgement enforceable by contempt, stating:

> IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that [Badger] is liable for disgorgement of $5,786,162.00, representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $7,650,788.54, for a total of $13,436,950.54. The [SEC] may *enforce the Court's judgment for disgorgement* and prejudgment interest *by moving for civil contempt* (and/or through other collection procedures authorized by law) at any time after ten days following entry of this Final Judgment.

*See id.* at 4–5 (emphasis added). The government's theory is that Badger is evading the disgorgement order by hiding assets in the names of alter egos. It wants a judicial declaration that Defendants are alter egos so that Badger, under pain of contempt, can be ordered to make the assets of his alter egos available for disgorgement. This is not the same as seeking to enforce a money judgment against Defendants.

Defendants also argue that there is no evidence that they were involved in Badger's improper conduct. But this argument goes to the merits of the alter-ego claim, not to whether the FDCPA bars the claim. We therefore reject Defendants' contention

22

that the disgorgement order is subject to the FDCPA.[5]

### III.  CONCLUSION

We AFFIRM the district court's denial of summary judgment on the FDCPA issue.  We REVERSE the grant of summary judgment on the alter-ego claims and REMAND for further proceedings.  We DENY the United States' contingent motion to certify.

---

[5] We note that we are not as confident as the Fifth Circuit that disgorgement does not come within the meaning of *restitution* in the FDCPA, 28 U.S.C. § 3002(3)(B).  The Restatement (Third) of Restitution repeatedly refers to disgorgement as a type of restitution.  *See, e.g.*, Restatement (Third) of Restitution §§ 3 cmts. a–c, e, 39(3), 51(4) (Am. Law Inst. 2011).  But even if disgorgement is a form of restitution under the FDCPA, the statute states that it "shall not be construed to supersede or modify the operation of— . . . (7) any Federal law authorizing, or any inherent authority of a court to provide, injunctive relief; [or] (8) the authority of a court— . . . (C) to exercise the power of contempt under any Federal law."  28 U.S.C. § 3003(c).  The statute therefore does not limit a federal court's authority with respect to disgorgement injunctions or contempt sanctions.  The Seventh Circuit recently applied this exception to the FDCPA in similar circumstances.  In *NLRB v. HH3 Trucking, Inc.*, 755 F.3d 468, 469 (7th Cir. 2014), owners of a company had been held in contempt for failure to comply with a back-pay order issued as a remedy for unfair labor practices.  The court held that the FDCPA's state-law exemptions for pension-fund distributions were not applicable, because under 28 U.S.C. § 3003(c)(8)(C), the statute does not apply in "a proceeding to remedy a contempt of court."  *Id.* at 472.